ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

FILED

APR 1 9 2006
APR 19 2006
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

United States of America ex rel.    )
   )
   Rosendo Hernandez   K81640    )
(Full name and prison number)    )
(Include name under which convicted)    )
   )
PETITIONER    )    CASE NO: _____
   )        (Supplied by Clerk of this Court)
   vs.    )
   )
Don, Hulick Warden    )    **06C2183**
(Warden, Superintendent, or authorized    )    **JUDGE BUCKLO**
person having custody of petitioner)    )    **MAGISTRATE VALDEZ**
   )
RESPONDENT, and    )
   )
**(Fill in the following blank only if judgment**    )
**attacked imposes a sentence to commence**    )
**in the future)**    )
   )
ATTORNEY GENERAL OF THE STATE OF    )    Case Number of State Court Conviction:
   )
   )    97-CR-21329
_____    )
(State where judgment entered)    )

## PETITION FOR WRIT OF HABEAS CORPUS -- PERSON IN STATE CUSTODY

1. Name and location of court where conviction entered: Circuit Court of Cook County
2600 South California Avenue, Chicago, Illinois 60608

2. Date of judgment of conviction: May 1, 2000

3. Offense(s) of which petitioner was convicted (list all counts with indictment numbers, if known)

4. Sentence(s) imposed: 55 years, 25 years and 20 years

5. What was your plea? (Check one)     (A) Not guilty    (✗)
                                       (B) Guilty        ( )
                                         (C) Nolo contendere    ( )

If you pleaded guilty to one count or indictment and not guilty to another count or indictment, give details:

7. Jesus Gonzalez testified that he had never seen petitioner prior to the shooting. (Tr.173-174) On cross-examination, Jesus Gonzalez admitted that he never saw petitioner fire a gun! (Tr.187) Jesus Gonzalez testified that the shooting did not start until Daniel "Congo" Violante jumped over the fence (Tr.187-188) and as soon as shots were fired he ran into the house. (Tr.185) This corroborates the testimony of Nancy Alvarado when she testified that everybody ran into the house once Daniel "Congo" Violante jumped the fence. Jesus Gonzalez's own admission establishes that he did not see petitioner shoot anybody.

8. Jesus Gonzalez testified that he went to the police station on June 29, 1997 and picked out a photo of petitioner as being one of the shooters. (Tr.169-171) Jesus Gonzalez testified that on June 30, 1997, he picked petitioner out of a lineup as the person pointing the gun at the decedent. (171-173) Notably, on cross-examination, Jesus Gonzalez revealed that "all of the photographs (i.e., police photos of petitioner including lineup photo) shown to him on direct examination was seen by him for the fits time just prior to his direct examination. (Tr.174-175) This was a bomb dropped on the prosecution, as it establishes the inescapable conclusion, which is, Jesus Gonzalez never picked out a photo of petitioner on June 29, 1997 or otherwise.

9. Maribel Gutierrez was called as a witness for the prosecution and did not provide any testimony which implicated the petitioner. In fact, Maribel testified that she was unable to identify any of the three men as she did not get a look at their faces. (Tr.197) The State Appellate Court correctly found likewise.

-5(c)-

person who shot the decedent. (Tr.113) Having thought someone is the shooter cannot be equated with a positive identification. Nancy testified to making an identification of a person in a photographic lineup as the person who shot Daniel "Congo" Violante a lot of times. (Tr.115-116) This court need to acknowledge the fact that Daniel "Congo" Violante was never shot and this fact underscores the willingness of a witness for the prosecution to lie! On many occasions during cross-examination, Nancy Alvarado invoked the familiar phrase of "I don't remember". Nancy testified that herself, Jesus Gonzalez, Jose Martin Gonzalez, Maribel Gutierrez and the decedent are all cousins. (Tr.95, 97, 142)

5. Amelia Gonzalez was called as a witness for the prosecution and gave no testimony which implicated the petitioner.

6. The State Appellate Court found that Jesus Gonzalez identified the petitioner from a photo array and from a police lineup as the person who pointed a gun at the decedent. The State Appellate Court further found that Jesus Gonzalez said both shooters were bald, but could not remember what they were wearing. The petitioner voluntarily turned himself over to police several days after the crime upon learning the police was looking for him. A photograph was taken of petitioner by the police and that photograph depict petitioner with hair on his head! Clearly, petitioner was not bald and the hair depicted by the arrest photograph is more than several days of head hair growth. Nancy Alvarado and Jesus Gonzalez said the shooters were bald. (Tr.188) The undeniable fact is that petitioner had hair on his head as patently evidenced by his arrest photograph! Being bald means just what it means! Clearly being bald cannot be equated with having hair on your head.

2. Importantly, on direct appeal, the State Appellate Court made no factual finding that the evidence was overwhelming against the petitioner.

3.The State Appellate Court found that Nancy Alvarado identified the petitioner from a photo array and a lineup as being one of the shooters, that petitioner was bald, and that the first gunman wore blue jeans and a white T-shirt. At petitioner's trial, Nancy Alvarado testified that three guys came walking toward them from Palmer Street, but she could not recognize none of the three guys when they were eight feet away. (Tr.99) Nancy Alvarado testified that the person shooting at Daniel Violante wore blue jeans and a white T-shirt. (Tr.134) Nancy further testified that petitioner was wearing a black T-shirt with green shorts, (Tr.140-141, 143-144) therefore, it is clear that the person shooting at Daniel Violante could not have been petitioner.

4. Nancy testified that she had never seen petitioner prior to the day of the shooting. (Tr.123) Nancy testified that when the person started shooting at Daniel "Congo" Violante everybody ran in the house! (Tr.139) Significantly, Nancy testified that when Daniel "Congo" Violante jumped over the fence, she was not watching any of the other people that were doing the shooting! (Tr.137) This raises the question of how can she identify petitioner as being a shooter when she was not watching anyone once Daniel "Congo" Violante jumped the fence? It is already established that petitioner could not have been the person shooting at Daniel "Congo" Violante. ** (See, Par. 3 supra) Nancy testified that she informed the police that she thought petitioner was the

_____ **/ The testimony of Nancy Alvarado and Jesus Gonzalez is reported in the report of proceedings dated August 9, 1999.

-5(a)-

## PART III -- PETITIONER'S CLAIMS

1. State <u>briefly</u> every ground on which you claim that you are being held unlawfully. Summarize <u>briefly</u> the <u>facts</u> supporting each ground. You may attach additional pages stating additional grounds and supporting facts. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds later.

**BEFORE PROCEEDING IN THE FEDERAL COURT, YOU MUST ORDINARILY FIRST EXHAUST YOUR STATE COURT REMEDIES WITH RESPECT TO EACH GROUND FOR RELIEF ASSERTED.**

(A) Ground one <u>Ineffective Assistance of Appellate Counsel.</u>
Supporting facts (tell your story <u>briefly</u> without citing cases or law):

1. Petitioner was denied effective assistance of appellate counsel, where on direct appeal, appellate counsel fail to raise the constitutional claim of petitioner not being proven guilty beyond a reasonable doubt. Notably, the petitioner in connection with this claim makes reference to the trial transcript thereby challenging factual findings made by the State Appellate Court on direct appeal. (See Page 5(a) through 5(g) for continuation)

(B) Ground two <u>Denial of Sixth and Fourteenth Amendments rights.</u>
Supporting facts:

24. Petitioner was denied a fair trial, due process of law and effective assistance of trial and appellate counsel, where a jury instruction on the issue of identification was unconstitutional on its face and operated to mislead the jury with regard to correctly evaluating and assessing testimony given by witnesses called by the prosecution, where trial fail to object to the giving of such unconstitutional jury instruction and where appellate counsel, on direct appeal, fail to challenge trial counsel's ineffectiveness concerning the issue. (See Page 5(h) through 5(k).

5

2. With respect to this conviction or sentence, have you filed a petition in a **state court** using any other form of post-conviction procedure, such as *coram nobis* or habeas corpus?   YES ( )        NO (✗)

    A. If yes, give the following information with respect to each proceeding (use separate sheets if necessary):

        1. Nature of proceeding   _____

        2. Date petition filed   _____

        3. Ruling on the petition   _____

        3. Date of ruling   _____

        4. If you appealed, what was
           the ruling on appeal?   _____

        5. Date of ruling on appeal  _____

        6. If there was a further appeal,
           what was the ruling ?   _____

        7. Date of ruling on appeal  _____

3. With respect to this conviction or sentence, have you filed a previous petition for habeas corpus in **federal court**?
        YES ( )   NO (✗)

    A. If yes, give name of court, case title and case number: _____

_____

    B. Did the court rule on your petition? If so, state

        (1) Ruling: _____

        (2) Date: _____

## 4. WITH RESPECT TO THIS CONVICTION OR SENTENCE, ARE THERE LEGAL PROCEEDINGS PENDING IN ANY COURT, OTHER THAN THIS PETITION?

**YES ( )   NO (✗)**

If yes, explain: _____

_____

raise reasonable doubt claim.

14. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel's representation of petitioner amounted to a clear conflict-of-interest.

15. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel fail to raise instances of trial counsel's ineffectiveness.

9. Petitioner was denied effective assistance of counsel, where trial counsel allowed the police to question petitioner without counsel knowing the underlying facts of the case.

10. Petitioner was denied effective assistance of counsel, where trial counsel fail to subpoena police photo gang books depicting gang members belonging to the Spanish Cobra gang.

11. Petitioner was denied effective assistance of counsel, where trial counsel fail to call an expert witness on gangs.

12. Petitioner was denied effective assistance of counsel, denied freedom from unlawful search and seizure, deprived of a fair trial and due process of law, where the cumulative effect of constitutional violations rendered the proceedings unfair.

13. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel fail to

5. Petitioner was denied effective assistance of counsel, where trial counsel neglected to conduct meaningful pretrial investigation of the case.

6. Petitioner was denied effective assistance of counsel, where trial counsel did not file a motion to suppress the lineup identification of petitioner based upon lack of probable cause to arrest.

7. Petitioner was denied effective assistance of counsel, where trial counsel did not locate, interview or call known witnesses which could have provided favorable testimony for petitioner.

8. Petitioner was denied effective assistance of counsel, where trial counsel did not file a motion in limine seeking to prohibit the prosecution from mentioning, eliciting testimony or introducing evidence concerning petitioner's co-defendant.

## Claims Raised In State Post-Conviction Petition

1. Petitioner denied effective assistance of counsel, a fair trial and due process of law where an unconstitutional jury identification instruction was given.

2. Petitioner was denied effective assistance of counsel, subjected to unlawful search and seizure, deprived of a fair trial and due process of law, where petitioner was arrested without a warrant or probable cause and where counsel did not challenge such illegality.

3. Petitioner was denied effective assistance of counsel, where trial counsel did not call expert witness to testify about unreliability of eyewitness identification.

4. Petitioner was denied effective assistance of counsel, a fair trial and due process of law, where trial counsel did not file a motion to suppress out-of-court lineup identification and in-court identification of petitioner.

# PART II -- COLLATERAL PROCEEDINGS

1. With respect to this conviction or sentence, have you filed a post-conviction petition in state court?

YES (X)   NO ( )

    With respect to *each* post-conviction petition give the following information (use additional sheets if necessary):

A. Name of court:   Circuit Court of Cook County

B. Date of filing:   June 3, 2003

C. Issues raised:   See, Pages 3(a) through 3(d) - Attached Hereto

D. Did you receive an evidentiary hearing on your petition?   YES ( )  NO (X)

E. What was the court's ruling?  Summarily dismissed post-conviction petition

F. Date of court's ruling:   August 8, 2003

G. Did you appeal from the ruling on your petition?   YES (X)  NO ( )

H. (a) If yes,  (1) what was the result?  Affirmed summary dismissal

          (2) date of decision:  June 30, 2005

    (b) If no, explain briefly why not: _____

I. Did you appeal, or seek leave to appeal this decision to the highest state court?

YES (X) NO ( )   No.

    (a) If yes,  (1) what was the result?  Petition For Leave To Appeal Denied

           (2) date of decision:   December 1, 2005

    (b) If no, explain briefly why not: _____

## ISSUES RAISED ON DIRECT APPEAL

**1. The** defendant was deprived of effective assistance of counsel, where he failed to present exculpatory alibi witnesses who were available, but were never investigated nor interviewed.

**2. The** defendant was denied his Sixth Amendment right to an impartial jury and therefore a fair trial.

**3. The** defendant was deprived of a fair trial, where the prosecution was allowed to present highly prejudicial evidence of gang affiliation and the alleged rank of the defendant as well as that of other defense witnesses.

**4. The** trial court's imposition of a fifty-five year sentence for murder, a twenty-five year sentence for attempted murder and a twenty year sentence for aggravated battery with a firearm was excessive and an abuse of discretion.

## PART I -- TRIAL AND DIRECT REVIEW

1. Kind of trial: (Check one):        Jury (X)        Judge only (  )

2. Did you testify at trial?    YES (X)        NO      (  )

3. Did you appeal from the conviction or the sentence imposed?  YES (X)   NO (  )

   (A)  If you appealed, give the

      (1) Name of court:  <u>Illinois Appellate Court</u>

      (2) Result:  <u>Convictions and Sentences affirmed</u>

      (3) Date of ruling:  <u>July 30, 2002  - No. 1-00-1916</u>

      (4) Issues raised:  <u>See, Page 2(a)  - Attached Hereto</u>

   (B)  If you did not appeal, explain briefly why not:

4. Did you appeal, or seek leave to appeal, to the highest state court?  YES (X)    NO (  )

   (A)  If yes, give the

      (1) Result  <u>Petition For Leave To Appeal Denied  -  No. 94769</u>

      (2) Date of ruling:  <u>December 5, 2002</u>

      (3) Issues raised:  <u>Same issues raised on direct appeal</u>

   (B)  If no, why not: _____

5. Did you petition the United States Supreme Court for a writ of *certiorari*?   Yes (  )   No (X)

   If yes, give (A) date of petition: _____  (B) date *certiorari* was denied:  _____

2

10. Juan Carlos Cruz was called as a witness for the prosecution.** The State Appellate Court found that Juan Carlos Cruz observed petitioner pull out a gun and pointed it at the decedent. The record of proceedings render such finding unreliable and constitutes an unreasonable determination of the facts. It must be remembered that the shooting started when Daniel "Congo" Violante jumped over the fence and according to Nancy Alvarado everybody ran into the house. Even the testimony of Maribel Gutierrez corroborates the fact that everybody ran into the house, including Juan Carlos Cruz, upon seeing the first gun pulled out. (Tr.196-197) Juan Carlos Cruz testified that he heard shots as he ran through the door. (Tr.14) There is nothing credible in the entire testimony of Juan Carlos Cruz which establish that petitioner was one of the shooters. In fact, Juan Carlos Cruz could not identify one article of clothing that petitioner was supposedly wearing (Tr. 44) and had never seen petitioner prior to the shooting. (Tr.30) Also, Juan Carlos Cruz did not give any testimony as to whether petitioner was bald or had hair on his head. The State Appellate Court found that "after" the shooting ceased, Juan Carlos Cruz went outside and found decedent lying on the ground with blood covering his face, it was at that juncture which Juan Carlos Cruz realized he had been shot. This finding illustrates that Juan Carlos Cruz was not attentive to what was happening, since he had no realization of sustaining gunshot wounds until after the shooting had stopped. Juan Carlos Cruz testified that he was never a member of a street gang. (Tr.5) However, the testimony of Daniel "Congo" Violante says different. (Tr.56)

---

__**/ The testimony of Juan Carlos Cruz is reported in the report of proceedings dated August 10, 1999.

-5(d)-

11. Daniel "Congo" Violante was called as a witness for the prosecution. The State Appellate Court made no finding that Daniel "Congo" Violante implicated petitioner in the crimes. However, Daniel "Congo" Violante testified that he was a convicted armed robber (Tr.66) and that when he identified the photograph of petitioner, he told police that petitioner was one of the shooters. (Tr.69) Nevertheless, Daniel "Congo" Violante came clean and testified that he did not see petitioner fire a gun! (Tr.69) Daniel "Congo" Violante testified that he did not know petitioner and had never seen him prior to the shooting (Tr.59) and could not remember what clothing petitioner was supposedly wearing on the night of the shooting. (Tr.65) Daniel "Congo" Violante testified that the man who approached him was not petitioner (Tr.83) and he never saw a gun in anyone else's hand. (Tr.90)

12. Jose Martin Gonzalez testified as a witness for the prosecution. The State Appellate Court found that Jose Martin Gonzalez observed petitioner draw a gun and fire multiple times at the decedent who fell to the ground. The petitioner challenge this finding as it is sufficiently rebutted by the record of proceedings. Jose Martin Gonzalez testified that petitioner had a chrome handgun (Tr.132) and petitioner shot the gun six times in a row without reloading it. (Tr.132-133) Jose Martin Gonzalez said the handgun was not a revolver or automatic! (Tr.133) This just highlights the absurdity of his testimony. Jose Martin Gonzalez could not remember how petitioner wore his hair, (Tr.133) could not remember the clothing which petitioner was supposedly wearing, (Tr.129) and could not remember whether petitioner had facial hair or not. (Tr.133) Jose Martin Gonzalez testified that he identified the petitioner from a lineup as the person who shot his cousin, namely the decedent. (Tr.119-120) Again, the court must be mindful of the fact that everybody ran into the house once Daniel "Congo"

-5(e)-

Violante jumped over the fence and the shooting started. There is nothing in the record of proceedings which establishes that any witness for the prosecution looking back to observe what was taking place while running into the house.

13. Nancy Jones, a witness for the prosecution, testified that she is an assistant medical examiner (Tr.72) Nancy Jones testified that an autopsy was performed upon the decedent, namely George Gonzalez. (Tr.77-78) She opined that the decedent died as a "result of multiple shotgun wounds". (Tr.99)

14. No physical evidence linked petitioner to the crimes.

15. All of the State's occurrence witnesses are biologically related and/or close friends.

16. At the trial of petitioner's co-defendant, Daniel "Congo" Violante testified that both of the shooters were bald, but that the people he picked out of the lineup had hair. (See, Exhibits D and E - Attached Hereto)

17. At the trial of petitioner's co-defendant, Nancy Alvarado testified that when she viewed the lineup containing petitioner, the only person in the lineup whose picture she had seen that same day was petitioner. (See, Exhibit A - Attached Hereto) Impermissible suggestiveness to say the least!

18. At the trial of petitioner's co-defendant, Nancy Alvarado testified that petitioner does have hair in People's Exhibit No. 7 and is not bald. (See, Exhibit A - Attached Hereto)

19. At the trial of petitioner's co-defendant Jesus Gonzalez

testified that both shooters had on "white shirts". (**See,** **Exhibit B** - **Attached Hereto**) At petitioner's trial, Jesus Gonzalez did not know what article of clothing petitioner supposedly was wearing. Apparently his memory improved with each trial.

20. At the trial of petitioner's co-defendant, Juan Carlos Cruz testified that he **did not** see anybody shooting!

21. Appellate counsel could have supplemented the record on petitioner's direct appeal with the co-defendant's trial transcripts, for purpose of enabling the reviewing court to see the different version of testimony given by witnesses for the prosecution.

22. Aside from inclusion of the trial transcripts of petitioner's co-defendant, if appellate counsel would have raised the reasonable doubt claim, just on the basis of the record of proceedings pertinent to petitioner's trial, a reasonable likelihood exist that petitioner would have prevailed on such constitutional claim on direct appeal.

23. This claim is not defaulted for the reasons expressed on page 6(a) and the reason set forth in the **miscarriage** **of justice exception** argument which is located at end part of this petition preceding the attached exhibits.

25. The petitioner realleges and incorporates paragraphs 1 through 24 herein.

26. The jury was given Illinois Pattern Jury Instructions No. 3:15 in petitioner's case without objection from trial counsel. The jury instruction at issue uses the conjunction "or" between the clauses serving to inform the jury how to weigh identification testimony. However, use of the word "or" between the clauses operates to mislead the jury and allow the jury to incorrectly weigh identification testimony.

27. Subsequent to petitioner's trial, the Illinois Appellate Court has condemned the jury instruction. Last year, the Illinois Supreme Court weighed in on the issue and determined that such instruction was legally impermissible.

28. The State Appellate Court made a finding that trial counsel was not ineffective for not objecting to the jury instruction, since petitioner's trial took placed before 2001. The petitioner challenges the factual finding by asserting that the erroneous jury instruction was reasonably foreseeable and facially unconstitutional. A reasonably competent defense lawyer would have known that weighing identification testimony consist of taken into account all five factors together as oppose to a jury instruction which direct the jury to consider only one of the factors. The State Appellate Court made a judicial admission that the jury instruction was improper! The issue of identification was paramount in petitioner's case and the jury being improperly instructed, resulted in prejudiced to petitioner's case, to the extent that a deprivation of a fair trial and denial of due process of law occurred.

29. The State Appellate Court made a finding that appellate counsel did not render ineffective assistance for failing to raise trial counsel's incompetence regarding the erroneous

jury instruction issue, since the evidence against petitioner was overwhelming where five witnesses identified petitioner as one of the shooters. The petitioner challenges the finding of the evidence being overwhelming for the following reasons:

(a). There is no physical evidence linking petitioner to the crimes.

(b). There are no incriminating statements, confessions or inculpatory admissions from petitioner.

(c). Nancy Alvarado, a witness for the prosecution, testified that the shooters were "bald". Petitioner's arrest and lineup photos depict him with hair on his head and a "long tail" in the back of his head. Nancy Alvarado admitted that she was not watching any of the other people doing the shooting once Daniel "Congo" Violante jumped over the fence. (Tr.137) Nancy Alvarado testified that everybody ran in the house when the person started shooting at Daniel "Congo' Violante. (Tr.139) Notably, Nancy Alvarado told police that she "thought" petitioner was one of the shooters. Having thought someone is a shooter is hardly a positive identification! Nancy Alvarado even lied by falsely testifying that Daniel "Congo" Violante was shot. (Tr.115-116)

(d). Jesus Gonzalez testified on cross-examination that he never saw petitioner fire a gun! Tr.187) How can it be said that a person identified someone as a shooter, when the person never saw the purported shooter firing a weapon?

-5(I)-

(e). Juan Carlos Cruz, a witness for the prosecution, testified that he could not identify none of the clothing which petitioner supposedly wore (Tr.44), had never before seen petitioner (Tr.30), and acknowledged that he heard shots as he ran through the door. (Tr.14) It is impossible to see who is shooting if a person, such as, Juan Carlos Cruz, is running through the door of a house without looking back! At the trial of petitioner's co-defendant, Juan Carlos Cruz testified that he <u>did not</u> see anybody shooting! (<u>See</u>, <u>Exhibit H</u>)

(f). Daniel "Congo" Violante, a witness for the prosecution, testified that he did not see petitioner fire a gun. (Tr.69) How an it be said that a person made an identification of a shooter, when such person testify to <u>not</u> observing the supposed shooter fire a gun? Another example of flawed fact-finding by the State Appellate Court. Furthermore, at the trial of petitioner's co-defendant, Daniel "Congo" Violante testified that both shooters were bald. (<u>See</u>, <u>Exhibits D and E</u>)

(g). Jose Martin Gonzalez, a witness for the prosecution, testified that he could not remember how petitioner wore his hair (Tr.133), could not remember the clothing which petitioner wore (Tr.129) and could not remember whether petitioner had facial hair or not. (Tr.133) Moreover, Nancy Alvarado testified unequivocally that <u>everybody</u> ran into the house when the shooting started. (Tr.139)

30. A reasonable probability exist that had appellate counsel mounted a challenge to trial counsel's ineffectiveness with regard to the jury instruction claim, the outcome of petitioner's direct appeal would have been different.

(C) Ground three   Ineffective Assistance of Trial Counsel.
Supporting facts:

31. Petitioner was denied effective assistance of counsel, where trial counsel fail to interview and call as witnesses, namely Jennifer Pinkston, Jeanine Gomolinski and Abraham Gutierrez, in which, petitioner's alibi would have been corroborated by witnesses that the prosecution would have been unable to attack their character and where counsel could have favorably used the testimony of Abraham Gutierrez. (See Page 6(d) through 6(e))

(D) Ground four   Denial of a Fair Trial, Due Process of Law, Unlawful Seizure,
Supporting facts:   Ineffective Assistance of Trial and Appellate Counsel.

38. Petitioner was denied effective assistance of trial and appellate counsel, subjected to unlawful search and seizure, deprived of a fair trial and due process of law, where trial counsel fail to seek quashing of petitioner's arrest, since the arrest was warrantless and made without probable cause and where appellate counsel fail to challenge trial counsel's ineffectiveness. (See Page 6(f) through 6(g))

2   Have all grounds raised in this petition been presented to the highest court having jurisdiction?
YES ( )   NO (X)

3.   If you answered "NO" to question (16), state briefly what grounds were not so presented and why not:

See, Pages 6(a) through 6(c) - Attached Hereto

6

## CONSTITUTIONAL CLAIMS NOT PRESENTED TO STATE'S HIGHEST COURT

1. Petitioner seeks to explain why certain constitutional claims advanced in this petition were not raised in an orderly fashion during petitioner's state court post-conviction proceedings.

2. Petitioner assert that appointed appellate counsel, namely Richard T. Niemerg, assigned to handle the appeal from the dismissal of the post-conviction petition, acting as an agent of the State of Illinois, deliberately failed to raise, on appeal, all of the constitutional claims that were presented in the petition for post-conviction relief. Moreover, the above-mentioned attorney deliberately failed to raise the constitutional claims advance in the post-conviction petition in a Petition For Leave To Appeal with the Illinois Supreme Court. Richard T. Niemerg worked for the Office of The State Appellate Defender, an agency that is funded by the State of Illinois, therefore, the above-mentioned attorney was undisputedly *acting as an agent* of the State of Illinois, at the time he caused petitioner's constitutional claims to be subjected to forfeiture at the federal level. Being an agent of the State of Illinois as well as the caused of subjecting some of petitioner's constitutional claims to potentially being defaulted, the State of Illinois cannot and must not now be heard to complain. Finally, in a letter dated December 16, 2005, the petitioner complained in written fashion relevant to how Richard T. Niemerg handled the appeal. (See, Exhibit No. 1 - Attached Hereto)

## CLAIMS RAISED IN POST-CONVICTION PETITION AND "NOT" RAISED ON APPEAL THEREFROM ON IN A PETITION FOR LEAVE TO APPEAL

3. Petitioner was denied effective assistance of counsel, subjected to unlawful search and seizure, deprived of a fair trial and due process of law, where petitioner was arrested without a warrant or probable cause and where counsel did not challenge such illegality.

4. Petitioner was denied effective assistance of counsel, where trial counsel did not call expert witness to testify about unreliability of eyewitness identification.

5. Petitioner was denied effective assistance of counsel, a fair trial and due process of law, where trial counsel did not file a motion to suppress out-of-court lineup identification and in-court identification of petitioner.

6. Petitioner was denied effective assistance of counsel, where trial counsel neglected to conduct meaningful pretrial investigation of the case.

7. Petitioner was denied effective assistance of counsel, where trial counsel did not file a motion to suppress the lineup identification of petitioner based upon lack of probable cause to arrest.

8. Petitioner was denied effective assistance of counsel, where trial counsel did not locate, interview or call known witnesses which could have provided favorable testimony for petitioner.

9. Petitioner was denied effective assistance of counsel, where trial counsel did not file a motion in limine seeking to prohibit the prosecution from mentioning, eliciting testimony or introducing evidence concerning petitioner's co-defendant.

10. Petitioner was denied effective assistance of counsel, where trial counsel allowed the police to question petitioner without counsel knowing the underlying facts of the case.

11. Petitioner was denied effective assistance of counsel, where trial counsel fail to subpoena police photo gang books depicting gang members belonging to the Spanish Cobra gang.

12. Petitioner was denied effective assistance of counsel, where trial counsel fail to call an expert witness on gangs.

13. Petitioner was denied effective assistance of counsel, denied freedom from unlawful search and seizure, deprived of a fair trial and due process of law, where the cumulative effect of constitutional violations rendered the proceedings unfair.

14. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel fail to raise reasonable doubt claim.

15. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel's representation of petitioner amounted to a clear conflict-of-interest.

16. Petitioner was denied effective assistance of appellate counsel, where on direct appeal appellate counsel fail to raise instances of trial counsel's ineffectiveness.

32. The petitioner realleges and incorporates paragraphs 1 through 31 herein.

33. Jennifer Pinkston and Jeanine Gomolinski were not called as witnesses for the petitioner, even though, both witnesses would have testified that petitioner as in attendance at Craft Bowl during the time of the shootings. Both witnesses were non-gang members.

34. The State Appellate Court found that calling the witnesses would have amounted to accumulative evidence and the outcome of the proceedings would not have been different, since five witnesses identified petitioner. The petitioner challenges the fact-finding of the State Appellate Court.

35. The prosecution would not have been able to attack the character, credibility and believability of Jennifer Pinkston or Jeanine Gomolinski with evidence of gang membership as it done with other witnesses that were called. Additionally, the State Appellate Court's finding that five witnesses identified petitioner is belied by the record. (See, Par.24 through 30, supra) This is a case where no physical evidence connected petitioner to the crimes and there was no incriminating statements, admissions or confession made by petitioner.

36. Defense counsel fail to interview and call Abraham Gutierrez as a witness and make use of the fact that Abraham Gutierrez provided the police with the names of petitioner and petitioner's brother, as the shooters, in order to win his release from police custody. Because this is a case where no physical evidence linked petitioner to the crimes, petitioner have thoroughly refuted the State Appellate Court's finding relevant to five witnesses identifying him as one of the shooters, defense counsel was

armed with information to present and argue to the trier of fact that the police focused upon petitioner after being provided with false information by Abraham Gutierrez.

37. Petitioner was severely prejudiced by defense counsel's incompetence in not calling Jennifer Pinkston and Jeanine Gomolinski to corroborate his alibi without attacked with gang affiliation by the prosecution. A reasonable probability exists that the result of the proceedings would have been different had counsel acted competently.

39. The petitioner realleges and incorporates paragraphs 1 through 38 herein.

40. This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on page 6(a) and in paragraph 23 on page 5(g).

41. Incontrovertibly, at the time of petitioner's arrest the police had no judicial warrant and no probable cause existed. Petitioner voluntarily went to the police station upon learning that the police were looking for him.

42. A police report jointly authored by detectives Guevara and Halvorsen (See, Exhibit K) clearly demonstrates that petitioner was arrested on June 30, 1997 at 2200hrs. Importantly, at this point, petitioner is under arrest without any of the so-called State's occurrence witnesses selecting him out of lineup, since a lineup had not been conducted. In fact, the lineup was not conducted until 11:30pm on June 30, 1997. (See, Exhibit L.)

43. Officer Bemis, witness for the prosecution, testified that petitioner was a known member of the Insane Spanish Cobra Street Gang. (Tr. 158) Officer Bemis testified that he is a "Gang Specialist" (Tr.162) and the Gang Unit of the Chicago Police Department keeps information on various known gang members. (Tr. 166-167) Nancy Alvarado, Jesus Gonzalez and Daniel "Congo" Violante informed the authorities that the shooters were bald. Petitioner's arrest photograph does not show him to be bald! Additionally, Juan Carlos Cruz admitted during the trial of petitioner's co-defendant that he did not see nobody shooting - just

-6(f)-

heard shots being fired. Jose Martin Gonzalez testified on June 29, 1997, he viewed photo books of known members of the Spanish Cobras Street Gang and did not make any identification.

44. Trial counsel rendered ineffective assistance when he did not challenge the arrest of petitioner as being unconstitutional based upon what was known to police at the time of petitioner's arrest in conjunction with the absence of a judicial warrant. Providing defense counsel would have filed a motion to quash arrest, in all likelihood, such motion would have been successful. Petitioner was gravely prejudiced by counsel's ineptitude.

45. On direct appeal, appellate counsel fail to raise trial counsel's ineffectiveness germane to the arrest issue. The outcome of petitioner's direct appeal would have been different had appellate counsel discharged the duty of raising trial counsel's serious blunder.

## GROUND FIVE

Ineffective Assistance of Trial and Appellate Counsel, Denial of a Fair Trial and due process of law.

## SUPPORTING FACTS

**46.** Petitioner was denied effective assistance of trial counsel, deprived of a fair trial and due process of law as well as denied effective assistance of appellate counsel, where trial counsel fail to file a motion to suppress the out-of-court and in-court identification of petitioner and where appellate counsel fail to challenge defense counsel's ineffectiveness.

**47.** The petitioner realleges and incorporates paragraphs 1 through 45 herein.

**48.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g)**.

**49.** Defense counsel knew upon being tendered discovery material and prior to trial, that Juan Carlos Cruz, Jose Gonzalez and Jesus Gonzalez were shown "photo books" of known gang members of the Spanish Cobras and could not identify any of them as being involved in the crimes which led to the shooting death of George Gonzalez. **See, Exhibit M**

**50.** According to the trial testimony of officer Bemis, the petitioner was a known member of the Spanish Cobras, therefore, within those "photo books" had to be a picture of petitioner. The petitioner know that his photograph is contained within the police photo books of known members of the Spanish Cobra Street Gang, since such book was shown to petitioner by an officer Orozco on a prior arrest for disorderly conduct.

-6(h)-

**51.** Trial counsel knew that Nancy Gonzalez and Jesus Gonzalez, Daniel Violante told police that the shooters were bald. Trial counsel knew that petitioner and his brother had hair on their head on the day of the lineups. Trial counsel knew that the photo array which was shown to the occurrence witnesses contained photographs of petitioner and his brother taken years earlier when they were indeed bald. **(People's Group Exhibit 1a through 1L** contains the photographs of petitioner and his brother when **they were bald years prior** to the crimes occurring.

**52.** Trial counsel was suspicious of the police conduct inasmuch as coaching/suggesting that witnesses point out the petitioner in the lineup and this is why counsel requested to be in the room with the witnesses viewing the lineup. **(See, Group Exhibit I)**

**53.** Defense counsel knew or should have known that detective Guevara has a checkered past with respect to coaching witnesses during lineups and other impropriety. **(See, Exhibit Q - Affidavit of Dr. Thomas Streed Attached to Post-Conviction Petition.** Also, several opinions of the Illinois Appellate Court has criticized practices of detective Guevara.

**54.** Significantly, a factual basis existed for trial counsel to file a motion to suppress out-of-court lineup identification on grounds of it being unduly suggestive Notably, hours before the lineup the detective Guevara had shown witnesses a photo array which contained a picture of petitioner, taken years earlier when he was bald, in a subtle way signaled to the witnesses to select petitioner from the lineup. This very practice is what the leading experts on eyewitness identification counsel against! Furthermore, to show that some suggestive tactics were employed during the lineup procedure, look at the testimony of Juan Carlos Cruz, in the trial of petitioner's co-defendant, where he testified that, "he did not see nobody shooting". **(See, Exhibit H)** Since Juan Carlos Cruz did not see nobody shooting, it begs the question of how can he identify petitioner from a lineup?

**55.** Undoubtedly, Nancy Gonzalez Alvarado testified at petitioner's trial that she had never seen petitioner before. Jesus Gonzalez testified that he had never seen petitioner before. Likewise, Maribel Gutierrez, Juan Carlos Cruz, Daniel Violante and Jose Gonzalez all testified that they had never seen petitioner before. This makes it clear that there was no independent basis for a valid in-court identification.

**56.** Trial counsel's performance fell below the threshold of reasonable competency and the prejudice resulting therefrom caused petitioner to be tried on serious criminal charges where the lineup identification process had been tainted, as a result of unduly suggestiveness and improper police tactics being employed to induce witnesses to identify the petitioner. The petitioner is entitled to have all out-of-court identification and all in-court identification vacated thereby paving the way for petitioner's release.

**57.** On direct appeal, appellate counsel provided ineffective assistance by virtue of not challenging trial counsel's incompetence pertinent to failure to file a motion to suppress out-of-court and in-court identifications made of petitioner. A reasonable probability exist that had appellate counsel advanced the issue of trial counsel's ineffectiveness, then the results of petitioner's direct appeal would have been different.

## GROUND SIX

**Ineffective Assistance of Trial and Appellate Counsel.**

## SUPPORTING FACTS

**58.** Petitioner was denied effective assistance of trial counsel and appellate counsel, where defense counsel fail to procure and call an expert witness to testify regarding the unreliability of eyewitness identification and where appellate counsel fail to challenge trial counsel's subpar representation on appeal.

**59.** Petitioner realleges and incorporates paragraphs 1 through 57 herein.

**60.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on page 6(a) and in paragraph 23 on page 5(g).

**61.** During a post-trial hearing, trial counsel testified that "once he received discovery material and reviewed it, he knew that identification would be a <u>central</u> issue in the case." (<u>See</u>, <u>Exhibit N</u>)

**62.** Trial counsel knew that no physical evidence tied petitioner to the crimes. Trial counsel further knew that no damning inculpatory statements, confessions or admissions were obtained from petitioner.

## FACTORS DESTROYING PURPORTED WITNESS IDENTIFICATION

**63.** The record of proceedings reflect that Nancy Alvarado and Jesus Gonzalez told police that the shooters were bald.

64. Daniel "Congo" Violante testified that he told police that he did not observe petitioner shooting a gun. (Tr.90) Daniel "Congo" Violante testified at the trial of petitioner's co-defendant that both of the shooters were bald. The arrest photo taken of petitioner show that he had hair on his head. Daniel "Congo" Violante testified at the trial of petitioner's co-defendant that he was not paying much attention to the person he claims was petitioner. (See, Exhibit C) Daniel "Congo" Violante testified at the trial of petitioner's co-defendant, "that when he viewed the lineups, he saw two of the same people he had looked at photos of a few hours earlier." (See, Exhibits F and G)

65. Juan Carlos Cruz testified at the trial of petitioner's co-defendant that he did not see nobody shooting.

66. Nancy Alvarado testified that everybody ran into the house when the first shot was fired at Daniel Violante.

67. Officer Bemis testified that petitioner was a known member of the Spanish Cobras. However, on June 29, 1997, Jose Martin Gonzalez, Juan Carlos Cruz and Jesus Gonzalez were shown photo books of known members of the Spanish Cobras, but could not make any identifications.

68. Nancy Alvarado testified that petitioner had on a black T-shirt and green shorts, but she amazingly tell the police tat she thought petitioner was one of the shooters. It must be remembered that she ran into the house when the first shot was fire at Daniel "Congo" Violante and he testified that it was not petitioner shooting at him, therefore, how could Nancy Alvarado observe anything after the first shot, since her own admission has her running into the house and not looking back to see what is happening? Also, Jesus Gonzalez testified at the trial of petitioner's co-defendant that both shooters wore white shirts.

**69.** During opening statements of petitioner's trial, the prosecutor told the jury that petitioner produced a handgun an opened fire. The State's own witness, namely Nancy Jones, testified that she conducted an autopsy upon the decedent and he died as a result of multiple shotgun wounds. Nobody ever testified that petitioner or his co-defendant had a shotgun.

**70.** Nancy Gonzalez Alvarado testified at petitioner's trial, that "Congo" (i.e., Daniel Violante) was shot a lot of times. The truth of the matter is that "Congo" was not shot! This raises questions regarding Nancy's attentiveness to the event, her level of certainty about what occurred and her willingness to say anything on the witness stand.

**71.** Daniel Violante testified at petitioner's trial, that as soon as he saw the gun, he turned to get away, and was not looking at anybody else.

**72.** Daniel Violante testified at petitioner's trial, that the man pointed the gun at his stomach. However, Nancy Alvarado and Juan Carlos Cruz said the man (who they identified as Juan Hernandez) pointed the gun at Daniel's head. A clear situation of State witnesses impeaching each other and being unable to have a cohesive story.

**73.** Daniel Violante testified at petitioner's trial, that he never observed petitioner fire a gun.

**74.** Daniel Violante testified at petitioner's trial, that he could not remember what clothing petitioner had on.

**75.** At petitioner's trial, Daniel Violante initially said, "that he did not see the other two men". When the prosecutor took this testimony by surprise and exclaimed, "I'm Sorry" it was only then that Daniel Violante said he had seen one of the men. This instance reflect that Daniel Violante was very willing to accommodate whatever the prosecution wanted out of him irrespective of the truth.

-6(m)-

**76.** The prosecution stipulated that Juan Carlos Cruz initially informed the police that it was four offenders involved. However, Juan Carlos Cruz denied he ever told police such thing. The stipulation binds the prosecution It demonstrates that Juan Carlos Cruz will testify to whatever he believes will help convict the petitioner. The stipulation reflect negatively upon his attentiveness of the incident and his certainty about what occurred.

**77.** Juan Carlos Cruz testified at petitioner's trial, that petitioner was screaming out "Disciple Love, Cobra Killer". However, Nancy Alvarado testified that petitioner did not say anything Once again, you have the State's own witnesses impeaching each other, thereby casting doubt upon their individual and collective attentiveness to the events, their certainty of what transpired and their identification.

**78.** Juan Carlos Cruz testified at petitioner's trial, that there were no lights on the porch or turn on in the house. One street light was the only source of lighting. This establishes that the farther away from the street light the offenders stood, the harder it was to actually see them. This explains why Nancy Alvarado could not recognize none of the three guys when they were eight feet away.

**79.** Jesus Gonzalez testified at petitioner's trial, that as soon as shots were fired at Daniel Violante, he ran into the house. Jesus Gonzalez admitted that he did not actually see the person shoot at Daniel Violante and he never observed petitioner fire a gun.

**80.** Jose Martin Gonzalez testified at petitioner's trial, that he could not remember the clothing that petitioner had on. This illustrates his lack of attentiveness, perception and certainty.

**81..** Jose Martin Gonzalez testified at petitioner's trial, that the men came running up to the scene. He stands alone on this accounting of the event.

**82.** At petitioner's trial, detective Renaldo Guevara testified that

showing of the photo array on June 29, 1997, was his first involvement with the case. This is totally untrue! On June 29, 1997, detective Guevara was involved in showing "Gang Photo Books of known Spanish Cobras" to Jose Martin Gonzalez, Juan Carlos Cruz and Jesus Gonzalez **before** the photo array was shown.

**83.** Trial counsel knew **before** trial that the State's occurrence witnesses had given the police conflicting statements about what occurred and that major conflicts, discrepancies, contradictions and inconsistencies exists pertinent to their identification of the offenders.

**84.** Having an expert witness in this case would have allowed trial counsel to elicit specific testimony regarding mistaken identification, witnesses susceptibility to suggestiveness, how the emotional trauma of a shooting incident can adversely affect a person's ability to recall or identify someone, how the identification procedures used by the police in this particular case were fraught with subtle bias and suggestiveness and counsel would have been able to craft a powerful closing argument based upon testimony of an expert witness to destroy the credibility, believability and reliability of the State's occurrence witnesses who identified petitioner as partaking in these crimes.

**85.** Gary Wells, a Professor of psychology at the University of Iowa and a leading eyewitness scholar, who has studied eyewitness identification for **25 years** have found that "mistaken identification" is the single largest source of wrongful conviction. **(See, Exhibit O Attached To State Post-Conviction Petition)**

**86.** Leading experts in the field of eyewitness identification collectively agree that all lineups, photo spreads and other identification processes should be videotaped. **See, Jim Dwyer, Barry Scheck and Peter Neufeld, Actual Innocence - Chapter**

**Three (Signet, 2001).** Videotaping was not done in this case.

87. One study found that 84% of wrongful convictions rested, at least in part, on mistaken identification by eyewitnesses. **See, Jim Dwyer, Barry Scheck and Peter Neufeld, Actual Innocence, Page 73 (Signet 2001)**

88. Due to the number of exonerations of the wrongfully convicted, the United States Department of Justice conducted a study and published a guide entitled, "Eyewitness Evidence: A Guide For Law Enforcement". This guide recommend that an independent examiner should run the lineups and photo spread; the examiner should not know who the suspect is to avoid dropping hints; eyewitnesses should be explicitly told that suspect might not be in lineup or photo spread, therefore, eyewitnesses should not feel compelled to make an identification, etc.

89. In the case sub judice, no independent examiner conducted the lineup or photo spread. Instead, it was conducted by detective Guevara who has an established history of suggestive/compelling tactics when it comes to lineups. The aspect is elaborated upon in connection with another legal claim of this petition.

---

** / Due to petitioner's incarceration, lack of resources and indigency, he is unable to include a copy of the above-mentioned U.S. Department of Justice Guide or the Actual Innocence book authored by Jim Dwyer, Barry Scheck and Peter Neufeld. However, with the assistance of appointed counsel such supporting material can be procured.

**90.** The petitioner's photograph was displayed in a 12 picture photo array hours before the lineup. Suggestiveness can be created in many subtle ways. Here petitioner was the only person common to the photo array and lineup.

**91.** The testimony of the State's occurrence witnesses are riddled with conflicting versions of the events, witnesses impeaching each other, self-impeachment, giving testimony which defy human understanding (e.g. Jose Gonzalez testifying that petitioner had a handgun, but it was not a revolver or an automatic and where Nancy Alvarado testified that Daniel "Congo" Violante was shot a lot of times, when he was not shot at all) major contradictions and giving different testimony at the trial of petitioner's co-defendant.

**92.** Trial counsel was deficient in his performance of not securing an expert witness on eyewitness identification, in which, such expert testimony in all probability spelled the difference between guilt and innocence. This failure of trial counsel resulted in the State's case not being subjected to proper and/or meaningful adversarial testing.

**93.** Appellate counsel did not provide constitutionally acceptable representation in connection with petitioner's direct appeal, since trial counsel's ineffectiveness was not challenged. Providing appellate counsel would have attacked trial counsel's incompetence, in all probability, the results of petitioner's direct appeal would have been different given the weakness of the State's case against petitioner.

## GROUND SEVEN

Ineffective Assistance of Trial and Appellate Counsel.

## SUPPORTING FACTS

**94.** Petitioner was denied effective assistance of trial counsel and effective assistance of appellant counsel, where defense counsel fail to conduct meaningful pretrial investigation of the case and where appellate counsel did not challenge trial counsel's ineffectiveness.

**95.** Petitioner realleges and incorporates paragraphs 1 through 93 herein.

**96.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g)**.

**97.** Upon being tendered discovery material and reviewing it, defense counsel knew that the issue of identification would be the key issue in the case. **See, Exhibit N** Also, defense counsel knew that detective Guevara was involved with the identification process in connection with this case.

**98.** Prior to the trial of the petitioner there existed written documentation and court opinions and court cases relevant **(See, Exhibit Q - Affidavit of Thomas Streed - Attached to State Post-Conviction Petition)** to the highly questionable tactics, practices and modus operandi of detective Guevara with regard to witnesses identifying individuals as perpetrators of various crimes which went unsolved until detective Guevara became involved.

**99.** Defense counsel, with a bare minimum of effort, could have learned a wealth of information about the underhandedness of detective Guevara. Having learned of detective Guevara's shady past, it would have alerted counsel to pursue the filing of a motion to quash arrest and a motion to suppress lineup

-6(r)-

identification, especially since defense counsel was suspicious about the lineup process and procedure to begin with.

**100.** Defense counsel's glaring omission as described in this legal claim amount to a performance that was objectively unreasonable. In all probability, the petitioner would have been successful in litigating a motion to quash arrest as well as a motion to suppress the lineup identification had counsel made use of available information regarding detective Guevara's wicked past.

**101.** On direct appeal, appellate counsel provided substandard representation by not challenging trial counsel's unconstitutional performance. The outcome of petitioner direct appeal, in all likelihood, would have been different if appellate counsel would have raised trial counsel's ineffectiveness with regard to not conducting adequate pretrial investigation of the case.

## GROUND EIGHT

Ineffective Assistance of Trial and Appellate Counsel

## SUPPORTING FACTS

**102.** Petitioner was denied effective assistance of trial and effective assistance of appellate counsel, where trial counsel fail to locate, interview and call known witness that could have provided favorable testimony and where appellate counsel fail to challenge trial counsel's ineffectiveness.

**103.** Petitioner realleges and incorporates paragraphs 1 through 101 herein.

**104.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g).**

**105.** Defense counsel did not contact, interview or call Hector Vasquez as a witness, even though, the discovery material tendered to defense counsel by the prosecution, revealed that Hector Vasquez observed a large vehicle with tinted windows driving westbound on Palmer Street after he heard shots fired. **(See, Exhibit R)** Defense counsel could have made use of the knowledge and observations of Hector Vasquez insofar as arguing to the trier of fact that the offenders fled in such vehicle, but <u>none</u> of the State's occurrence witnesses put the petitioner in such vehicle.

**106.** Defense counsel did not contact, interview or call Nicole Nathaniel as a witness, even though, the discovery material tendered to defense counsel by the prosecution, revealed that

Nicole Nathaniel heard some gunshots on Mobile Street, looked out her window and observed three males get into the back seat of a large dark colored vehicle and drove westbound on Palmer Street. **(See, Exhibit S)** Defense counsel could have made use of the knowledge and observations of Nicole Nathaniel in terms of arguing to the jury that the offenders fled in a vehicle and none of the State's occurrence witnesses ever testified to seeing the petitioner exit or enter a vehicle. The petitioner informed defense about Nicole Nathaniel. **(See, Exhibit T)**

**107.** The petitioner informed defense counsel that Maria Gutierrez and Elbia Gutierrez had observed the people living at 2208 North Mobile and 2212 North Mobile representing the Disciple street gang with hand signs and heard them yelling "Disciple Rule" **(See, Exhibit T)** Moreover, defense counsel was well aware of the existence of Maria Gutierrez and Elbia Gutierrez and what they told the police once counsel was tendered discovery material. **(See, Exhibit U)**

**108.** Defense counsel was ineffective for not making use of available witnesses in terms of their observations and knowledge. All of the State's occurrence witnesses, except for Daniel Violante, denied being in a gang - specifically the Maniac Latin Disciples. Maria Gutierrez and Elbia Gutierrez could have refuted many of the denials of gang involvement, thereby providing the jury with a different picture of the occurrence witnesses. Even the police listed Juan Carlos Cruz as being affiliated with the Maniac Latin Disciples. **(See, Exhibit V)** Defense counsel did not even utilize such revelation to the advantage of the petitioner by having the author of the police report subpoenaed to expose the gang involvement of Juan Carlos Cruz and to demonstrate to the jury that he has a propensity to be less than truthful even under oath.

**109.** Identification was the biggest issue in this case and since there was no physical evidence, incriminating statements, confessions or inculpatory admissions made by the petitioner, _every_ attack upon the State's occurrence witnesses was a vital move which could spell the difference between a guilty and not guilty verdict, therefore, petitioner suffered prejudiced by counsel's unprofessional error.

**110.** On direct appeal, appellate counsel was not functioning as a competent legal advocate, since trial counsel's ineffectiveness was not challenged. A reasonable probability exist that petitioner's direct appeal would have been successful if appellate counsel would have advanced trial counsel's ineffectiveness, especially since the prosecution's case against was not overwhelming when the record of proceedings are carefully scrutinized.

## GROUND NINE

Ineffective Assistance of Trial and Appellate Counsel

## SUPPORTING FACTS

**111.** Petitioner was denied effective assistance of trial counsel and effective assistance of appellate counsel, where defense counsel fail to file a motion in limine to bar the prosecution and its witnesses from mentioning the name of petitioner's co-defendant and from eliciting testimony regarding pertaining to anything about petitioner's co-defendant and where appellate counsel fail to raise trial counsel's ineffectiveness.

**112.** Petitioner realleges and incorporates paragraph 1 through 110 herein.

**113.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g)**.

**114.** Petitioner was tried <u>separately</u> from his co-defendant which happens to be petitioner's biological brother, namely Juan Hernandez.

**115.** Since petitioner's trial was <u>severed</u> from his co-defendant, the petitioner was entitled to be tried on whatever evidence the prosecution proffered against him and <u>not</u> evidence against the co-defendant.

**116.** The record of proceedings concerning petitioner's trial is <u>replete</u> with instances of the prosecution eliciting testimony from their witnesses which named petitioner's co-defendant or identified him as doing something.

**117.** The jury learned from the testimony of officer Bemis that petitioner and his co-defendant were brothers. **(Tr. 158-159, 161)**

**118.** Defense counsel <u>never</u> objected to none of the testimony elicited by the prosecution concerning petitioner's co-defendant. The jury could only draw negative inferences against petitioner from testimony which it deemed damning to petitioner's co-defendant The introduction and admissibility of all testimony and evidence regarding petitioner's co-defendant usurped the purpose of petitioner having a separate trial.

**119.** All of the State's occurrence witnesses gave testimony about petitioner's co-defendant that could have been looked upon as unfavorable by the jury and by extension carried over to petitioner. The petitioner is entitled to a new trial free from the potentially adverse influence of testimony concerning petitioner's co-defendant.

**120.** On direct appeal, appellate counsel did not provide petitioner with effective assistance, since trial counsel's inability to render objectively reasonable representation was not challenged. In all probability, the direct appeal of petitioner would have been successful if appellate counsel would have lodged a challenge to trial counsel's ineffectiveness.

## GROUND TEN

Ineffective Assistance of Trial and Appellate Counsel

## SUPPORTING FACTS

**121.** Petitioner was denied effective assistance of trial counsel and effective assistance of appellate counsel, where defense counsel allowed the police to question petitioner without knowing the underlying facts of the shootings and where appellate counsel fail to challenge trial counsel's ineffectiveness.

**122.** Petitioner realleges and incorporates paragraphs 1 through 120 herein.

**123.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g)**.

**124.** Defense counsel testified during proceedings involving the case of Juan Hernandez that the police would not tell him anything as to when the shooting occurred. (**See, Group Exhibit I**) Kent Brody further testified that he learned of when the shooting took place only after petitioner had been identified in a police lineup and during the course of questioning. (**See, Group Exhibit I**)

**125.** It is crystal clear that petitioner was under arrest within one hour after voluntarily coming to the police station.

**126.** No competent lawyer practicing criminal defense would permit police questioning of a client that is under arrest and the police will not disclose any information about the date and time of the shooting.

**127.** The petitioner would not have subjected himself to police interrogation had defense counsel not told petitioner to answer

any and all questions the police ask you. **(See, Exhibit W)**\*\*

**128.** Due to counsel's faulty legal advice, the prosecution was able to bring in witnesses during rebuttal and such witnesses attributed various statements to petitioner. Absent counsel's unprofessional performance, the petitioner would have exercised his constitutional right to remain silent!

**129.** On direct appeal, appellate counsel was incompetent for failing to raise trial counsel's ineffectiveness. In all likelihood, the petitioner's would have received a favorable ruling if appellate counsel would have challenged trial counsel's ineffectiveness.

____\*\*_/The petitioner assert that with the assistance of appointed counsel the petitioner can secure affidavits from criminal defense attorneys practicing law in Cook County and supporting the petitioner's position that they would not allow their client to be subjected to questioning under the circumstances of this case.

## GROUND ELEVEN

Ineffective Assistance of Trial and Appellate Counsel

## SUPPORTING FACTS

**130.** Petitioner was denied effective assistance of trial counsel and effective assistance of appellate counsel, where defense counsel fail to subpoena the police photo gang books relating to members belonging to the Spanish Cobra Street Gang and where appellate counsel fail to challenge trial counsel's incompetence.

**131.** Petitioner realleges and incorporates paragraphs 1 through 129 herein.

**132.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23 on page 5(g)**.

**133.** There can be no denying that the police department involved in this case maintain "photo gang books" depicting pictures of members of the Spanish Cobra Street Gang. This is verified by virtue of detective Guevara showing "photo books of known members of the Spanish Cobra Street Gang" to Juan Gonzalez, Jose Martin Gonzalez and Jesus Gonzalez. **(See, Exhibit M)**

**134.** Officer Bemis told the jury that petitioner is a known member of the Spanish Cobra Street Gang. The police maintain photo books of all known members of the Spanish Cobra Street Gang such as petitioner. Defense counsel was derelict in his professional representation of petitioner for not subpoenaing the photo gang books of members of the Spanish Cobra Street Gang. Accessing such photo gang books would have proven that petitioner's picture is included therein and Jose Gonzalez, Jesus Gonzalez and Juan Carlos Cruz could not identify him. A fact that could have been argued to the jury and

cast a cloud over the identification aspect of the three aforesaid occurrence witnesses' testimony.

**135.** Defense counsel's failure to subpoena the photo gang books resulted in prejudice to the petitioner as he could not make use of the inability of the three occurrence witnesses' non-identification of him from the photo gang books. This was not a case where the evidence of guilt is overwhelming or strong when properly scrutinized without distortion of the record of proceedings.

**136.** On direct appeal, appellate counsel rendered ineffective assistance by not challenging trial counsel's ineptitude. In all likelihood, petitioner would have succeeded on this claim if appellate counsel had mounted a challenge to trial counsel's ineffectiveness.

## GROUND TWELVE

Ineffective Assistance of Trial and Appellate Counsel, unlawful search and seizure, denial of a fair trial and due process of law

## SUPPORTING FACTS

**137.** The petitioner contend that the cumulative effect of constitutional violations set forth in this petition warrant habeas relief.

**138.** Petitioner realleges and incorporates paragraphs 1 through 136 herein.

**139.** This constitutional claim is not subjected to the procedural default and/or waiver doctrine for the reasons expressed on **page 6(a)** and in **paragraph 23** on **page 5(g)**.

## RELIEF REQUESTED

**(i).** Permit petitioner to file an amended/supplemental petition.

**(ii).** Permit petitioner to file supplemental documentation to support his claims.

**(iii).** Grant petitioner an evidentiary hearing.

**(iv).** Appoint petitioner a lawyer.

**(v).** Order petitioner's release from custody.

# MISCARRIAGE OF JUSTICE EXCEPTION

- There is no physical evidence linking petitioner to the crimes.

- Petitioner made no confession, incriminating statements or admissions to the crimes.

- Nancy Alvarado, Daniel "Congo" Violante and Jesus Gonzalez all told the authorities that the shooters were bald. The photo taken of petitioner upon being arrested for the shootings show that petitioner have hair on his head and a long tail in the back of his head.

- Juan Carlos Cruz <u>admitted</u> at the trial of petitioner's co-defendant that he did not see <u>nobody</u> shooting. No identification can be made when a person does not see nobody doing any shooting!

- Nancy Alvarado testified that <u>everybody</u> ran in the house when the first shot was fired at Daniel "Congo" Violante.

- Jose Martin Gonzalez testified that on June 29, 1997, he viewed <u>police photo books</u> of known members of the Spanish Cobras Street Gang and did not make any identification. Officer Bemis testified that petitioner was a known member of the Spanish Cobras.

- Daniel "Congo" Violante testified that he told police that he <u>did not</u> observe petitioner shooting a gun.

- The medical examiner testified the victim died from multiple shotgun wounds. Nobody ever testified to petitioner having a shotgun.

- Jesus Gonzalez testified at the trial of petitioner's co-defendant that both shooters wore <u>white</u> shirts. However, Nancy Alvarado testified that petitioner had on a "black T-shirt and green shorts". The colors of white and black are miles apart. The State's witnesses cannot get their story together.

- Nancy Alvarado testified that she told police that she "thought" petitioner was one of the shooters. Having thought something is not sufficiently conclusive when it comes to making a positive identification.

- None of the occurrence witnesses ever saw petitioner prior to the date of the shootings.

- Nancy Alvarado had the audacity to testify that Daniel "Congo" Violante got shot several times. The fact of the matter is that he was <u>never</u> shot!

- Daniel "Congo" Violante testified a car was used in the commission of the shootings. <u>Nobody</u> ever testified to observing petitioner exit or enter a vehicle!

- Petitioner voluntarily surrendered to the authorities which is consistent with what an innocent person would do.

## PART IV -- REPRESENTATION

Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

(A) At preliminary hearing  No preliminary hearing - charged via indictment

(B) At arraignment and plea  Kent R.Brody, 29 S. LaSalle St., Ste.328, Chicago, Ill.

(C) At trial  Same as above.

(D) At sentencing  Samuel S. Shim, 4801 W. Peterson, Ste. 1410, Chicago, Ill.

(E) On appeal  Samuel S. Shim,  "     "     "     "     "     "

(F) In any post-conviction proceeding  Self-Representation

(G) Other (state): Richard T. Niemerg, 211 West Wacker Drive, Ste. 1200,Chicago, Ill. (On appeal of post-conviction dismissal)

## PART V -- FUTURE SENTENCE

Do you have any future sentence to serve following the sentence imposed by this conviction?

YES ( )  NO (✗)

Name and location of the court which imposed the sentence:  Not Applicable

Date and length of sentence to be served in the future  Not Applicable

WHEREFORE, petitioner prays that the court grant petitioner all relief to which he may be entitled in this proceeding.

Signed on: _April 19, 2006_
(Date)                    _____
                          Signature of attorney (if any)

### I declare under penalty of perjury that the foregoing is true and correct.

_Rosendo Hernandez_
(Signature of petitioner)
K81640
(I.D. Number)
Menard Correctional Center
(Address)
P.O. Box 711
Menard, Illinois 62259

REVISED 01/01/2001

7

# EXHIBITS

**DATE: December 16, 2005**

**TO: Michael J. Pelletier**
   **Office of the State Appellate Defender**
   **203 North LaSalle Street**
   **Chicago, Illinois 60601**

**FROM: Rosendo Hernandez**
   **Reg. No. #K81640**
   **Menard Correctional Center**
   **P.O. Box 711**
   **Menard, Illinois 62259**

**In re: Matter concerning the handling of my appeal.**

**Since you are the deputy defender for the Office of the State Appellate Defender, I am contacting you to express my displeasure with regard to the manner which your office handled my appeal.**

**Your office assigned attorney Richard T. Niemerg to represent me on appeal from the dismissal of my post-conviction petition. The docket number assigned to the appeal by the Illinois Appellate Court is 1-04-0533.**

*Exhibit No. 1*

Notably, in my post-conviction petition there was close to 20 legal claims, if not more, that were raised and the petition including its exhibits exceeded 100 pages.

On appeal from the dismissal of my post-conviction petition, Richard T. Niemerg raised only two legal claims and one of the legal claims was not even raised in the post-conviction petition. On June 30, 2005, the Illinois Appellate Court affirmed the circuit court's dismissal of my post-conviction petition. On December 1, 2005, the Illinois Supreme Court denied the Petition For Leave To Appeal.

Consequently, because Richard T. Niemerg only raised one legal claim that was contained in my post-conviction petition, this approach means that all of the remaining constitutional claims presented in the post-conviction petition will be deemed to be procedurally defaulted when my case enters federal court.

*ExHiBiT No. 1*

I am wrongfully convicted for a crime I did not commit or have any participation of knowledge thereof. However, because your office, through the actions of Richard T. Niemerg, I may find myself spending the rest of my life imprisoned!

It is completely unfair, disturbing and highly prejudicial for your office to engage in the practice of law, where legal claims of meritorious nature are being <u>abandoned</u> on appeal, thereby ensuring that the legal claim will be procedurally defaulted when the case goes into federal court on habeas review. What your office done in my case was a major disservice that have a profound and lasting adverse effect. An injustice was done to me upon being arrested, tried, convicted and sentenced for a crime I did not commit. Your office has compounded the injustice!

Sincerely,

*Rosendo Hernandez*
**Rosendo Hernandez**

EXHIBIT No. 1

1     Q.   I'll show you People's Exhibit Number 7 for

2   identification.  Is the lineup with Rosendo Hernandez

3   that you picked out, number 4?

4     A.   Yes.

5     Q.   Would you look at him in that picture?  Does

6   he have hair in that picture?

7     A.   Yes, he does.

8     Q.   He is not bald in that picture?

9     A.   No, he ain't.

10    Q.   Do you think he grew that hair in 3 days from

11   the day the shooting took place until the day of that

12   lineup?

13    MS. GAMBINO:  Objection.

14    THE COURT:  Overruled.

15    THE WITNESS:  I don't know.  If he has hair, he

16   has hair.  I don't know.

17    MR. GIOVANNINI:

18    Q.   He didn't have that hair the day he did the

19   shooting, though, did he?

20    A.   No.

21    Q.   Incidentally when you looked at this  lineup,

22   the only person in that lineup whose picture you had

23   seen that same day was Rosendo Hernandez, right?

24    A.   Un-huh.

- EXHIBIT A

1     A.   Yes.

2     Q.   That was also away from where you were at,

3  right, southbound?

4     A.   Yes.

5     Q.   Now, Jesus, the man that you say came up and

6  talked to Daniel about maybe ten feet from the porch,

7  tell us what he had on.

8     A.   I don't remember.  All I remember is a white

9  shirt.

10    Q.   Short-sleeved shirt or a long-sleeved shirt?

11    A.   It was short-sleeved.

12    Q.   Do you remember anything else he had on?

13    A.   No, I can't remember.

14    Q.   How about the person that stood by your

15  cousin George, what did he have on?

16    A.   That's all I remember, a white shirt.

17    Q.   He didn't have a black shirt on.  He had a

18  white shirt on, right?

19    A.   Yeah.

20    Q.   So both of them had white shirts on,

21  correct?

22    A.   Yeah, that I remember.

23    Q.   Do you remember if the guy that was talking

24  to Daniel had shorts on or full length pants?

— EXHIBIT B

77

1    and him to pull a gun out?

2        A.    Yes.

3        Q.    You never saw that person before in your
4    life?

5        A.    Never.

6        Q.    And did the person that was standing over by
7    your cousin George, did he ever say anything?

8        A.    No.

9        Q.    You weren't paying much attention to him?

10       A.    No.

11       Q.    You were able two days later to come over
12   and pick out his photograph out of that group of
13   photographs, is that right?

14       A.    Yes.

15       Q.    What did the person that came up to you and
16   talked to you, what did he have on that night?

17       A.    The person that talked to me?

18       Q.    Yes.

19       A.    He had on green shorts and a white shirt.

20       Q.    And how about the other guy that was
21   standing by George?

22       A.    He was wearing a white shirt and blue pants
23   I believe.

24       Q.    And how about the third guy that was

- EXHIBIT C

129

```
 1    standing next to him?

 2         A.    I didn't see what he was wearing.

 3         Q.    They were standing together, weren't they?

 4         A.    Yes.

 5         Q.    How close were the two other guys to each

 6    other?

 7         A.    I didn't pay attention to it.

 8         Q.    You weren't paying attention to that?

 9         A.    No.

10         Q.    You never saw either one of them before

11    either?

12         A.    No.

13         Q.    When you talked to the police, one thing you

14    told the police is that both guys that you saw out

15    there, the guy that you talked to and the guy that

16    was standing by George, you told them that they were

17    bald, didn't you?

18         A.    Yes.

19         Q.    And they were?  They didn't have any hair,

20    did they?

21         A.    They had a little bit of hair.

22         Q.    More than you have now or about the same?

23         A.    A little bit more than I got now.

24         Q.    When you say bald, what do you mean by bald,
```

- *EXHIBIT 9*

1     short hair?

2          A.    Short hair.

3          Q.    And how would you characterize your hair

4     right now?

5          A.    I got a little bit of hair.  I consider

6     myself bald.

7          Q.    You consider yourself bald?

8          A.    Yes.

9          Q.    Well, when you picked out the people in the

10    lineups, they had hair, didn't they?

11         A.    Yes.

12         Q.    And you looked at those lineups three days

13    later after George got shot, right?

14         A.    Yes.

15         Q.    So those people must have grown that hair in

16    three days?

17         MS. WOOD:  Objection.

18         THE COURT:  Sustained.

19    BY MR. GIOVANNINI:

20         Q.    Well, they had a lot more hair than they had

21    when they did the shooting, didn't they?

22         MS. WOOD:  Objection.

23         THE COURT:  You can answer.

24

- EXHIBIT E

1    pictures the day before, didn't you?

2        A.    I didn't know.

3        Q.    They never told you that they went down to

4    the police station and identified somebody?

5        A.    No.

6        Q.    Didn't you guys talk about that when you

7    were at the wake?

8        A.    No.

9        Q.    Did you talk about it at any time from the

10   time George got shot until the time at the wake when

11 · you saw those photographs?

12       A.    No.

13       Q.    Did you talk to anybody about what happened?

14       A.    No.

15       Q.    None of your fellow gang bangers?

16       A.    No.

17       Q.    None of your friends?

18       A.    No.

19       Q.    None of your relatives?

20       A.    No.

21       Q.    Incidentally, the wake was held three days

22   later, right?

23       A.    Yes.

24       Q.    The same day that you went and saw the

- EXHIBIT F

140

1    photos, right?

2        A.   Yes.

3        Q.   And then when you went to see the lineups,

4    you saw two of the same people you just saw in the

5    photos, correct?

6        A.   Yes.

7        Q.   A couple of hours before?

8        A.   Yes.

9        MR. GIOVANNINI:  Nothing further.

10        THE COURT:  State, anything further?

11        MS. WOOD:  One moment.  No further questions.

12        THE COURT:  Thank you, sir.  You may step down.

13                                (Witness excused.)

14        THE COURT:  You may call your next witness.

15        MS. WOOD:  Judge, the State next calls Juan Cruz.

16        THE COURT:  You may inquire.

17        MS. WOOD:  Thank you, your Honor.

18

19

20

21

22

23

24                                - Exhibit G

141

1    Q.   One of the guys stopped by 2208 how many

2    feet from you, the guy that stood by where George

3    was?

4    A.   About three, four feet.

5    Q.   And the other guy walked a little bit over

6    where he met Daniel, right?

7    A.   Yes.

8    Q.   How long do you think it took Daniel and

9    that other guy to exchange the few words that they

10   had?

11   A.   A few seconds.

12   Q.   And that's when a gun was pulled?

13   A.   Yes.

14   Q.   And would it be fair to say at that point

15   your main objective is to get Maribel and to get in

16   the house?

17   A.   Yes.

18   Q.   You didn't actually see anybody firing

19   shots, you heard some shots?

20   A.   Yeah, I did not see anybody fire a shot.   I

21   heard shots.

22   Q.   And that's because you were on your way into

23   the house?

24   A.   Yes.

*- EXHIBIT H*

HOMICIDE/FIRST DEGREE MURDER
VICTIM: GONZALEZ, Jorge

IN CUSTODY:                    HERNANDEZ, Juan  M/WH/Age 20, DOB 20 Dec.
                               76, 4029 N. Kenneth, Home Ph# 773-725-
                               2826, Single, Unemployed, 5-06, 135 lbs.
                               Hair black, Eyes brown, Build medium,
                               Complexion medium, SS# 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, Known
                               member of the Spanish Cobras Street Gang,
                               Nickname of "POOCHIE", IR# 1095572, CB#
                               10562850

DATE, TIME, LOCATION           Juan HERNANDEZ and Rosendo HERNANDEZ were
OF ARREST:                     both arrested on 30 June 97, 2200 hrs.
                               25th District Station, 5555 W. Grand Ave.

ARRESTING OFFICERS:            Ptlmn. J. BEMIS       #10354, 25th Dist.
                               Ptlmn. M. BROSNAN     #4926,       "
                               Ptlmn. M. OLSZEWSKI   #4337,       "
                               Ptlmn. S. SESSO       #7692,       "
                               Ptlmn. J. KOLODZIEJ   #15772,      "
                               Ptlmn. K. WICKERY     #6268,       "
                               Ptlmn. C. VIRGILIO    #17870,      "

                               Det. E. HALVORSEN     #20692, Area Five
                               Det. R. GUEVARA       #20861,      "

CHARGES, COURT BRANCH          Juan HERNANDEZ and Rosendo HERNANDEZ were
AND DATE:                      both charged with, First Degree Murder,
                               720 ILCS 5/9-1a2,  Branch 66, 1 July 97,
                               Charges approved by A.S.A. H. BRUALI,
                               Felony Review

EVIDENCE:                      Inv. #1819192, Area Five
                               (12) B&W CPD Identification Photos

                               Line-Up Photos

NOTIFICATIONS:                 A.S.A. Heather BRUALI, Felony Review
                               A.S.A. George ANDREWS,        "

INTERVIEWED:                   HERNANDEZ, Rosendo M/WH/Age 40, DOB 1 Jun.
                               57, 4029 N. Kenneth, Home Ph# 773-725-
                               2826, SS# 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

                               HERNANDEZ, Esther F/WH/Age 41, DOB 6 Nov.
                               55, 4029 N. Kenneth, Home Ph# 773-725-
                               2826, SS# 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

- EXHIBIT K

HOMICIDE/FIRST DEGREE MURDER
VICTIM: GONZALEZ, Jorge

PAGE (2)

PERSONS VIEWING LINE-UP:         GONZALEZ, Nancy
(In Order They Viewed)            GONZALEZ, Jose
                                         VIOLANTE, Daniel
                                         CRUZ, Juan
                                         GONZALEZ, Jesus

PERSONS PARTICIPATING IN LINE-UP:   #1) CASTRO, Miguel M/WH/Age 20,
(From Left To Right)                4814 W. Belden, 5-11, 200 lbs.

                                  #2) FLORES, Ricardo M/WH/Age 22,
                                  1823 N. Lawndale, 5-08, 200 lbs.

                                  #3) DIAZ, Jose  M/WH/Age 19,
                                  4127 S. Artesian, 5-09, 220 lbs.

                                  #4) HERNANDEZ, Rosendo M/WH/Age
                                  19, 5-07, 150 lbs. CB# 10562700

                                  #5) ORTEGA, Mario  M/WH/Age 25,
                                  3451 W. Parker, 6-00, 150 lbs.

                                  #6) COLON, Edgardo M/WH/Age 19,
                                    3704 W. Cortland, 5-11, 200 lbs.

PERSONS IDENTIFIED IN LINE-UP:     #4) HERNANDEZ, Rosendo

HISTORY & INVESTIGATION:          On 30 June 97, at 2350 hrs. a
                                  line-up was conducted at Area
Five Detectives, relative to a suspect in the murder of Jorge
HERNANDEZ and shooting of Juan CRUZ.   This line-up was viewed
separately by, Nancy GONZALEZ, Jose GONZALEZ, Daniel VIOLANTE, Juan
CRUZ and, Jesus GONZALEZ.

                                  Nancy GONZALEZ, Jose GONZALEZ,
                                  Daniel VIOLANTE, Juan CRUZ and
Jesus GONZALEZ all identified #4) Rosendo HERNANDEZ as one of the
offenders who had a gun and fired shots.

                                  The    attorney    for    Rosendo
                                  HERNANDEZ,   Kent   BRODY   was
present with his client.   The participants in this line-up were
viewed while standing.

Det. E. HALVORSEN #20692
Det. R. GUEVARA   #20861



- EXHIBIT L

DETECTIVE DIVISION                    3                    1 JULY 1997
AREA FIVE VIOLENT CRIMES                                  RD# B-394733

HOMICIDE/FIRST DEGREE MURDER
VICTIM: GONZALEZ, Jorge

                         SOLIS, Rosa F/WH/Age 31, DOB 16 Aug. 66,
                         2839 W. Logan Blvd. Ph# 773-276-9732,
                         Owner of Rosa's Pizza, 3268 W. Fullerton

A5JC

INVESTIGATION:          The R/Dets. were assigned to this
                        investigation on 29 June 97, by Sgt. R.
BIEBEL #1545, Area Five Detectives. The R/Dets. reviewed the
investigative file and determined that there were a number of eye-
witnesses. On 29 June 97, the R/Det. located, Juan CRUZ, Jose
GONZALEZ, and Jesus GONZALEZ. They were driven to Area Five
Detectives where they viewed photo books of known members of the
Spanish Cobras Street Gang. No identifications from these books
were made.

                        While these witnesses were still at Area
                        Five Detectives, the R/Dets. were
contacted by Sgt. R. DEGRAFF #1306, of the 25th District Gang Team.
The R/Dets. were informed by Sgt. R. DEGRAFF that on 28 June 97, an
unknown person had called the 25th District Gang Team and spoken
with Ptlmn. J. BEMIS. This unknown informant stated that he had
information about the shooting on Mobile. The informant stated
that "JUNEBUG" and "POOCHIE", two Spanish Cobras from the gang
section at Fullerton and Kilbourn were the shooters.

                        Ptlmn. J. BEMIS was familiar with this
                        gang and recognized the nicknames as
belonging to, Rosendo HERNANDEZ, aka "JUNEBUG" and Juan HERNANDEZ
aka "POOCHIE", who are brothers and both members of the Spanish
Cobras Street Gang.    Ptlmn. J. BEMIS obtained B&W CPD
identification photos of Rosendo HERNANDEZ IR# 1114308 and Juan
HERNANDEZ, IR# 1095572. Sgt. R. DEGRAFF gave these photos to the
R/Dets.

                        On 29 June 97, at 1800 hrs. Juan CRUZ,
                        Jose GONZALEZ, and Jesus GONZALEZ each
separately viewed a photo array in the conference room at Area Five
Detectives.   The photo array consisted of (12) CPD B&W
identification photos.   The photos were laid out on a table in
random order.  Juan CRUZ, Jose GONZALEZ, and Jesus GONZALEZ all
identified the photos of Rosendo HERNANDEZ and Juan HERNANDEZ as
being the two offenders who had guns and fired shots.

- EXHIBIT M

```
 1          THE CLERK:   Mr. Brody, raise your right hand,

 2   please.

 3                              (Witness sworn.)

 4          THE COURT:   You may inquire, counsel.

 5          MR. GIOVANNINI: Thank you.

 6               KENT BRODY,

 7   called as a witness on behalf of the Defense, having

 8   been first duly sworn, was examined and testified as

 9   follows:

10               DIRECT EXAMINATION

11                    BY

12               MR. GIOVANNINI:

13          Q   Sir, would you please state your name for

14   us and spell your last name?

15          A   My name is Kent Brody, that's B-r-o-d-y.

16          Q   Mr. Brody, what is your business or

17   occupation?

18          A   I'm an attorney.

19          Q   And are you licensed to practice law in the

20   State of Illinois?

21          A   I am.

22          Q   How long have you been so licensed?

23          A   It's actually 30 years yesterday.

24          Q   And in the practice of law, do you
```

*Group Exhibit I*

```
 1   specialize in any particular area of law?

 2              A    Most of my practice is a criminal practice.

 3              Q    Would that be criminal defense?

 4              A    Yes, it is.

 5              Q    Mr. Brody, I want to call your attention to

 6   the weekend of June 27, of 1997, were you practicing

 7   law at that time in Illinois?

 8              A    Yes, I was.

 9              Q    And where was your office located at that

10   time?

11              A    At that time, I don't know if we moved,

12   either at 334 South Dearborn or 116 South Michigan, I

13   believe 343 South Dearborn at that time.

14              Q    Sometime that weekend, did you have

15   occasion to be contacted by the defendant here, Juan

16   Hernandez and his brother, Rosendo Hernandez?

17              A    I did.

18              Q    And what was the nature of that contact?

19              A    I had a telephone call from Juan Hernandez.

20              Q    And did he inform you of anything at that

21   time or in that phone call?

22              A    Yes, he did.

23              Q    And what was that?

24              A    That he had been notified in some way that
```

29

GROUP EXHIBIT I

1  the police were looking for him with regard to a
2  shooting that had occurred sometime over that weekend.
3      Q   Did he mention to you that they were also
4  looking for his brother, Rosendo?
5      A   They did -- he did.
6      Q   What did you do in response to that
7  telephone call?
8      A   I had a telephone -- after my conversation
9  with Mr. Hernandez, he furnished me with the telephone
10 number of a police officer who had contacted him and I
11 contacted that police officer.
12     Q   Do you remember that officer's name?
13     A   I believe his name was Bemis, B-e-m-i-s.
14     Q   And how did you contact him?
15     A   By telephone.
16     Q   When you contacted him, what if anything
17 occurred?
18     A   We had a conversation.
19     Q   And the result of that conversation, what
20 happened after that conversation with Officer Bemis?
21     A   As a result of that conversation with
22 Officer Bemis, arrangements were made that Juan and
23 Rosendo Hernandez were going to go to Grand and
24 Central later on that evening.

30

*GROUP EXHIBIT I*

1    Q    During your telephone conversation with

2    Officer Bemis, did he tell you specifically why they

3    wanted to speak with Juan and Rosendo?

4    A    He did. He said there was a warrant for

5    their arrest.

6    Q    Did he tell you what that warrant was for?

7    A    He said it had to do with a shooting that

8    occurred over the weekend.

9    Q    Did he give you any more information other

10   than that?

11   A    He did not.

12   Q    When you went to Grand and Central, who

13   went with you?

14   A    I went to Grand and Central by myself.

15   After I arrived there at sometime after I arrived

16   there, Rosendo and Juan Hernandez and several other

17   people also arrived.

18   Q    And did you then present Juan and Rosendo

19   to Officer Bemis?

20   A    Officer Bemis and several other officers

21   were waiting for us there.

22   Q    And at the time that you did that, did you

23   know when the shooting had taken place that they were

24   interested in?

31

*Group Exhibit I*

1        A  I did not.

2        Q  Did you ever inquire of either Officer

3 Bemis or other officers when the shooting took place?

4        A  I did.

5        Q  And who did you talk to in that regard?

6        A  I talked to various officers during the

7 course of that particular evening but most of the

8 conversation was with Detective Guavara.

9        Q  When you asked Detective Guavara when the

10 shooting had taken place, did he give you an answer?

11       A  He did not.

12       Q  What did he say?

13     MS. WOOD: Objection, hearsay.

14     THE COURT:  Overruled, he may answer.

15       A  He asked if he could speak to my client, to

16 the clients.

17     MR. GIOVANNINI:

18       Q  Up to that point, did you know when the

19 shooting took place?

20       A  I did not.

21       Q  If we can go back just a brief bit, Mr.

22 Brody.  Prior to going into the police station with

23 your clients, did you meet with them ahead of time?

24       A  I talked to Juan Hernandez on the telephone

Group Exhibit I

```
 1   for -- he had called me.  After he called me I spoke

 2   to Bemis.  After I spoke to Bemis I called and had

 3   another phone conversation with Juan Hernandez.

 4         Q   Without saying specifically what was said

 5   over that phone conversation, what was discussed in

 6   general?

 7         A   What the option, what his options were,

 8   Rosendo's options were.

 9         Q   And was one of those options bringing him

10   down to the police station as you did?

11         A   It was.

12         Q   After Detective Guavara did not give you an

13   answer as to when the shooting took place, was there a

14   conversation between Detective Guavara and your 2

15   clients?

16         MS. WOOD: Objection.

17         THE COURT:  He may answer.

18         A   Yes, there was. Separately.

19         MR. GIOVANNINI:

20         Q   One at a time?

21         A   Yes.

22         Q   And after that conversation, what happened?

23         A   There were several conversations in the

24   course of the evening. There was also -- there was a
```

33

GROUP EXHIBIT I

```
 1   brief conversation, then there was a hold while there
 2   was a time where line-ups were set up.

 3        Q   Did you, while you were at the police
 4   station that evening, was one of the other people that
 5   arrived at that police station a woman that you now
 6   know to be named Rosa Solis?

 7        A   Rosa Solis did appear at the police
 8   station. I did not know her until that evening but she
 9   did arrive after we were already there.

10        Q   Would that be after Juan and Rosendo were
11   there?

12        A   Yes.

13        Q   Do you know whether she spoke to any police
14   officers that night?

15        A   Only by -- I wasn't there, but I was told
16   that she did.

17        MS. WOOD: Objection.

18        THE COURT: Sustained.

19        MR. GIOVANNINI:

20        Q   Now, when the detectives -- strike that.
21   Did Detective Guavara tell you he was going to have
22   your 2 clients stand in a line up?

23        A   Yes, he did.

24        Q   When he did that, did you make any requests
```

34

GROUP EXHIBIT I

1    of Detective Guavara?

2        A  I did.

3        Q  What was that?

4        A  I requested to be present in the room with

5    the witnesses who were going to be viewing the

6    line-up.

7        Q  Why did you make that request of Detective

8    Guavara?

9        A  Because I, for the purposes of insuring

10   that the line-ups were fairly held, I wanted to be in

11   the room.

12       Q  What type of things would you look for --

13   incidentally have you ever been present for line-ups

14   in the past?

15       A  I have.

16       Q  And have you ever been allowed to be in the

17   room with the witnesses as they viewed the ·line-up?

18       MS. WOOD: Objection, relevance.

19       THE COURT: ·You may answer.

20       A  Yes, I have.

21       MR. GIOVANNINI:

22       Q  What type of things do you look for as an

23   attorney when you view the witnesses viewing the

24   line-up?

35

*GROUP EXHIBIT I*

```
1              MS. WOOD: Objection.

2              THE COURT:  He may answer.

3         A   Among them would be first of all whether or

4    not the witnesses are viewing the line-up individually

5    or if they're all in the room at the same time,

6    whether there is any type of suggestive behavior, any

7    type of coaching going on and to determine for myself

8    the level of certainty as far as any identification or

9    non-identification that is made.

10             MR. GIOVANNINI:

11        Q   Is that why you requested of Detective

12   Guavara to be present with the witnesses during the

13   line-ups of Juan and Rosendo Hernandez?

14        A   It is.

15        Q   What did Detective Guavara tell you when

16   you asked him that?

17        A   He said that I would not be allowed in the

18   room with the witnesses, I would be allowed in the

19   room with the defendants but not in the room where the

20   witnesses were viewing the line-up.

21        Q   Did you explain to him at that time why you

22   wanted to be in that room with the witnesses?

23        A   To Detective Guavara and to the sergeant

24   whose name I don't recall who actually was insistent
```

36

*Group Exhibit I*

1    that I not be in the room.

2              Q   Did you in fact stay in the room with your

3    clients while they were participating in the 2

4    line-ups?

5              A   Yes, I did.

6              Q   From that position, briefly describe the

7    layout there where the witnesses were at looking at

8    the line up and where you were at as they relate to

9    each other?

10             A   Adjoining rooms, I'm in the room with I

11   don't recall which line up was first, whether the

12   line-up that Rosendo Hernandez was in or Juan

13   Hernandez was in, along with other individuals, in a

14   room separate from the viewing room.

15             Q   Do the people that view the line-up, they

16   look through basically a two way mirror to see the

17   line-up?

18             A   That's correct.

19             Q   So the people in the line up that are

20   standing in the line up, they can't see the witnesses,

21   correct?

22             A   That's correct.

23             Q   But the witnesses can see through and see

24   them, right?

37

*Group Exhibit I*

```
 1           A    That's been my experience.

 2           Q    Were you told by the detectives how many

 3   people viewed each of the line-ups, the one with Juan

 4   Hernandez and the one with Rosendo?

 5           A    Not at that time.

 6           Q    Were you able to see how many people went

 7   in to view that line up?

 8           A    Not at the time they went into the line up.

 9   I seen a number of individuals who had come in

10   together earlier before the line-ups were set up.

11           Q    During the line-ups, you couldn't see how

12   many people went in and viewed the line ups?

13           A    No, I could not.

14           Q    Were you later after the line-ups told the

15   results of the line-ups?

16           A    Yes, I was.

17           Q    And what were the results that you were

18   told?

19           MS. WOOD: Objection.

20           THE COURT:  Overruled. You may answer.

21           A    I was told that both of the individuals had

22   been identified by the witnesses as having

23   participated in the shooting that was under

24   investigation.
```

38

GROUP EXHIBIT I

```
 1          MR. GIOVANNINI:

 2          Q   Up until that time, had you yet learned

 3    when that shooting took place?

 4          A   No, I had not.

 5          Q   When did you first learn that the shooting

 6    had taken place on Friday, June 27th?

 7          A   In the course of the questioning of the

 8    defendants after the identifications in the line up.

 9          Q   And how did that come out the shooting took

10    place on the 27th?

11          MS. WOOD: Objection.

12          THE COURT:  Sustained.

13          MR. GIOVANNINI: I have no further questions.

14          THE COURT:  State, you may cross examine if

15    you wish.

16                    CROSS EXAMINATION

17                         BY

18          MS. WOOD:

19          Q   Mr. Brody, when you stood in the line up

20    room with your clients, they were allowed to choose

21    where they stood in the line up, correct?

22          A   Correct.

23          Q   And they were not made to do anything

24    unduly suggestive while standing in that line up, were
```

39

GROUP EXHIBIT I

1  they?

2          A    They were not.

3          Q    You said you've been an attorney for 30

4  years?

5          A    That's correct.

6          Q    At the time you were in the police station

7  and this defendant, Juan Hernandez and his brother

8  were standing in those line-ups, they had not been

9  charged with anything at that time, correct?

10          A    Well I had been told by detective -- by

11  Officer Bemis there was a warrant out for their arrest

12  which do me meant the process had been initiated.

13          Q    Well, they had not been formally charged at

14  that time that they stood in the line-ups, had they?

15          A    Evidently not.

16          Q    And you're well aware of the law in the

17  State of Illinois, aren't you?

18          THE COURT:  With regard to what, counsel?

19          MS. WOOD: With regard to a defendant's right

20  to counsel at a pre-trial line up.

21          A    I am aware of what the law is.

22          Q    And in fact the law doesn't even -- doesn't

23  say a defendant has a right to counsel at a line up

24  before he's been charged, isn't that true?

Group Exhibit I

1      A    It's discretionary as far as my
2  understanding was, with the investigating officers,
3  they could have let me or could not have let me.
4      Q    But under the law, they don't have to let
5  you?
6      THE COURT:    Don't argue, Counsel, you asked
7  your question and he answered it.
8      MS. WOOD: They did allow you to be present
9  with your clients?
10     A    In the room where they were being held, not
11 in the room where the witnesses were viewing the
12 line-up.
13     Q    And when you said Rosa Solis came into the
14 police station, she came into the police station with
15 the defendant's parents, didn't she?
16     A    I was not there when she actually arrived.
17 I was in the actual detective areas with one of the
18 defendants or talking to an officer so I can't really
19 say.
20     Q    When you saw Rosa Solis, Juan and Rosendo
21 Hernandez' parents were now at the police station,
22 correct?
23     A    That's correct.
24     MS. WOOD: If I may have a moment, Judge?

*Group Exhibit I*

```
 1            THE COURT:  Yes.

 2            MS. WOOD:

 3            Q  And Mr. Brody, when you talked earlier

 4    about line-ups with the witnesses, you said it was a

 5    sergeant that you spoke to, correct?

 6            A  It was several. Every officer involved in

 7    the investigation I made the request of. It appeared

 8    to me that the decision was finally made, the one

 9    definitively told me no was a sergeant.

10            Q  The sergeant was not involved in running

11    the lines ups, correct, to your knowledge?

12            A  They wouldn't allow me in the room so I

13    can't answer that question.

14            MS. WOOD: I have no further questions.

15            THE COURT: Counsel, any additional questions?

16                  REDIRECT EXAMINATION

17                        BY

18                  MR. GIOVANNINI:

19            Q  Mr. Brody, you later learned that there in

20    fact was not a warrant issued for your clients?

21            A  Yes, I did.

22            Q  It was contrary to what Officer Bemis had

23    told you on the phone, correct?

24            A  That's correct.
```

42

*Group Exhibit I*

```
 1              MR. GIOVANNINI: Nothing further, your Honor.

 2                   RECROSS EXAMINATION

 3                           BY

 4                     MS. WOOD:

 5         Q   Well, Mr. Brody, in fact there has been a

 6   stop order issued, correct?

 7         A   That's correct.

 8         Q   And a stop order means that the police are

 9   looking for your clients, correct?

10         A   I think you have to ask the police officers

11   the exact meaning of what a stop order is.  I know

12   it's not a warrant.  I know it's not a judicially --

13   no Judge has indicated there is an arrest warrant for

14   the person.

15         Q   Your 30 years of practice you heard of a

16   stop order I'm sure?

17         A   I have but I'm not a police officer.

18         Q   You know a stop order is based on probable

19   cause to pick up a defendant in a case?

20         A   That's an assumption that I would not make.

21              MS. WOOD: I have nothing further, Judge.

22              THE COURT:  Anything further?

23              MR. GIOVANNINI: Nothing further.

24              THE COURT:  Thank you Mr. Brody?
```

43

*Group Exhibit I*

1       Q.    And you represented a number of defendants
2    who had been charged with violent crimes?

3       A.    That is correct.

4       Q.    Including murder?

5       A.    Yes, sir.

6       Q.    And Rosendo Hernandez was one of your
7    client?

8       A.    Yes.

9       Q.    Now, would it be fair to say that in your
10   assessment of the case after receiving all of the
11   discovery and reviewing all of the discovery, that
12   one of the central issues in this case was that of
13   identification?

14      A.    Yes, it was.

15      Q.    Okay. And would it be fair to say that
16   earlier or early in the case, you along after
17   consulting with your client, Rosendo Hernandez,
18   decided an alibi defense would be the defense that
19   you would interpose in this case?

20      A.    That's correct

21      MS. AGUILAR: Objection.

22      THE COURT:  What is the basis of the objection?

23      MS. AGUILAR: I believe it's outside of the

24   motion for a new trial.  I believe it's irrelevant as


20

- Exhibit N

**CHICAGO POLICE DEPARTMENT**
**DETECTIVE DIVISION**
**SUPPLEMENTARY REPORT**

R.D. B 394 733
28 Jun 97
PAGE # 3

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

2208 W. Mobile      basement      QUESADA, Maria F/WH/23 years, dob 27 Aug 74, no phone
QUESADA Isidra F/WH/21 years, dob 15 May 75, both in basement with children heard approximately 5 gunshots did not see anything

2209 W. Mobile      SANTINI, Nell F/W/81 years, dob 20 Feb 16, phone# 773-889-3745, heard 3 gunshots and looked outside and observed a male rubbing his leg and other males attempting to help someone in the bushes across the street

2213 W. Mobile      GIANDONATO, Janice F/WH/79 years, dob 28 Jan 18, phone# 773-622-7688, heard 3 gunshots then a pause then 2 gunshots, did not look out until Police arrived

2215 W. Mobile      basement      JOHNSON, Marie F/W/53 years, dob 6 Jul 43, no phone, heard 3 gunshots then her dog began to bark. JOHNSON quieted her dog and heard 2 more gunshots, looked out side and observed numerous persons running around, then asked her landlord to summon the Police. JOHNSON stated that on other occasions she has heard the people who sit in front of 2208 yell "folks" to passing vehicles

2216 N. Mobile      1st floor      Roberto MENDEZ M/4/36 years dob 21 Sep 60, who related that he was awakened by 3 or 4 apparent gun shots. MENDEZ saw nothing.

2216 N. Mobile      basement      Carlos GUTIERREZ M/4 who related that he was awakened by 3 or 4 apparent gun shots. GUTIERREZ saw nothing.

2222 N. Mobile      1st floor      Maria CUEVAS F/4/13 years dob 18 May 84, who related she heard 3 or 4 shots. CUEVAS saw nothing.

2152 N. Mulligan      Hector VASQUEZ M/4/20 years dob 21 Mar 77, phone 773-622-1738, who related that he was walking down the alley behind 2212 N. Mobile when he heard 1 apparent gun shot fired from in front of 2208 N. Mobile. VASQUEZ then heard numerous other shots. Moments later VASQUEZ observed a large 4-door black vehicle with tinted windows drive Westbound on Palmer past the alley he was in. After this vehicle passed the alley VASQUEZ thought that someone was throwing bottles at this car but saw nothing. The reporting observed a broken bottle on Palmer Street West of Mulligan.

Det. B. Brennan      #20673
Det. M. Mason       #20702
Det. E. Wodnicki    #20418

— *Exhibit R*

CHICAGO POLICE DEPARTMENT                                  R.D. B 394 733
DETECTIVE DIVISION                                         28 Jun 97
SUPPLEMENTARY REPORT                                       PAGE # 7

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

and blue jeans.  GONZALEZ described the second subject as a M/4/17 5'07",
170, Med. complexion wearing a white t-shirt and green shorts.  GONZALEZ
described the third subject as a M/4, dark complexion, 5'07", 170 lbs., unk.
clothing description.  GONZALEZ related that subjects #2 and #3 stopped in
front of 2208 N. Mobile and #1 walked up to 2212 N. Mobile then stopped.   #1
said to Daniel VIOLANTE, "What's up maniac."  Daniel replies "What's up."  #1
pulls a small black handgun from his front pants waistband then points it at
Daniel's chest.  Daniel ran and #1 shot twice at him but missed.  #1 yells
"D.K." which GONZALEZ knows to mean Disciple Killer.  #1 also yelled Cobra
Love.  #1 then walks up in front of 2208 N. Mobile.  #2 pulled a larger
handgun from his front pants waistband and fired 6 or 7 shots at Jorge
GONZALEZ.  GONZALEZ was struck and fell to the ground.

Daniel VIOLANTE                          related that he was sitting on the front
                                         porch of 2212 N. Mobile with a group of
friends and relatives.  VIOLANTE stated that other friends were on the front
porch of 2208 N. Mobile.  When VIOLANTE observed 3 M/WH's approach on foot
from the south.  VIOLANTE gave descriptions of these individuals to the
reporting.  VIOLANTE related that one of these subjects stated "do you guys
gangbang".  VIOLANTE related that he and his friends replied that they were
not in a gang.  VIOLANTE then stated that the individuals began to yell
"maniac" and then "maniac killer, cobra love".  When the individuals began to
yell at least two produced guns.  One fired at VIOLANTE who jumped a fence
and ran.  VIOLANTE stated that he hurt his knee as he fled.  VIOLANTE felt he
could make identifications if he saw the individuals again.

Miguel SEPULVEDA                         was interviewed at the scene and related
                                         that he was exiting Santiago's restaurant
located on Grand Av. between Mobile and Mulligan.  SEPULVEDA further related
that he heard several gunshots and walked towards the sound of the gunfire.
SEPULVEDA could add nothing further.

Nicole NATHANIEL                         was interviewed at her residence which is
                                         located on the northwest corner of Mobile
and Palmer.  NATHANIEL related that her apartment overlooks both streets and
that she heard five gunshots on Mobile.  NATHANIEL looked out of the window
and observed what she believed to be three M/2 or M/4's get into a black or
dark colored full size four door automobile.  This vehicle was parked on
Palmer Av. west of Mobile and before the alley.  NATHANIEL related that all
three persons got into the back seat and the car drove west on Palmer.
NATHANIEL related that she heard a single gunshot coming from the vicinity of
Palmer and Mulligan followed by the sound of a bottle breaking.  NATHANIEL
described these persons as follows; #1 M/4/17-19, thin, black curly hair,
white shirt, blue jeans.  #2 and #3 as M/4/17-19.  N.F.D.



                              This investigation remains in PROGRESS...



                              Det. M. MASON #20702
                              Det. B. BRENNAN #20673
                              Det. E. WODNICKI #20418
                              Area Five Detective Division

                                    — EXHIBIT S

## AFFIDAVIT STATEMENT

Rosendo Hernandez Jr. _____, being first duly sworn on his oath states that the following is true and correct to the best of his knowledge and belief:

I did infact inform my trial Lawyer(Kent Brody) that there were a number of eye witnesses that were never called by the prosecution, or further investigated by Detectives. Kent Brody did not go to the crime scene to investigate these eye witnesses, even after I specifically asked him to do so. I asked Kent Brody to interview these witnesses while being detained in the Cook County Jail no earlier than 6 months and no later than 1 year of my detainment. These witnesses that I speak of are on the Police Supplementary Reports. One of the witnesses in particular is Nicole Nathaniel who says that she actually saw the offenders get into the automobile, and she even gives a description of the offenders.

(Maria and Elbia Gutierrez) stated on the Supplemtary Reports that they thought the persons who resided at 2208 and 2212 N. Mobile were members of the Maniac Lantin Desciples street Gang, becouse they have seen them representing the Desciple street Gang with hand signs And saying Desciples Rule. All but one of the state witnesses denied ever being in the gang! These witnesse along with the Supplementary Reports that states that Juan Carlos was a member of the M.L.D.s street gang proves that these witnesses lied on the stand and committed purgery.

SUBSCRIBED and SWORN to
before me this 11th
day of April
to 2001.

_Rosendo Hernandez_
Affiant

_signature_
NOTARY PUBLIC

"OFFICIAL SEAL"
Renina Y. Lyke
Notary Public, State of Illinois
My Commission Exp. 08/22/2004

_ExhiBiT T_

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. B 394 733
28 Jun 97
PAGE # 2

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

*OFFENDER VEHICLE:               DNA

*SERIAL NUMBERS:                 DNA

*METHOD CODE:                    DNA

*METHOD ASSIGNED CODE/UNIT:      1/650

THIS IS A CANVASS REPORT

2202 W. Mobile       basement       SMITH, James M/W/38 years, dob 20 Jan 59, phone# 773-889-7590, heard 5 or 6 gunshots then looked out the window and observed 2 females and 1 male running south on Mobile then heard glass breaking

2202 W. Mobile       1st floor       BUSCH, Elmer M/W/54 years, dob 16 Jan 33, phone 773-237-3748, heard and saw nothing

2203 W. Mobile                       PANI, Martha F/WH/19 years, dob 23 Oct 77, phone# 773-637-6450, heard 3 gunshots in front of the building then a pause then 1 or 2 more gunshots from the corner of Mobile and Palmer, PANI stated she heard yelling but could not make out what was being said

2204 N. Mobile       1st floor       Miguel LOPEZ M/4/17 years, dob 8 Oct 79, Home phone: 773-804-0610 who heard several apparent gun shots but saw nothing.

2204 N. Mobile       2nd floor       Oscar LOREDO M/4/23 years dob 21 Apr 73, No Phone, who heard several apparent gun shots but saw nothing.

2206 N. Mobile                       Maria GUTIERREZ F/4/19 years, dob 31 May 78
                                     Elbia GUTIERREZ F/4/21 years, dob 29 Apr 76, phone 773-637-5161, who related that they heard several apparent gun shots then went to their front window and observed two large light colored vehicles with lots of passengers driving in the street. Maria GUTIERREZ stated that she heard someone yell "You're gonna pay for what you did mother fucker." The GUTIERREZ's thought that the young men who reside at 2208 and 2212 N. Mobile are members of the Maniac Latin Disciple street gang because she has heard them yelling "Disciple Rule," and has seen them representing the Disciple street gang with hand signs.

2207 W. Mobile                       ANDERSON, Rose F/B/65 years, dob 12 Nov 31, phone# 773-804-0857, heard 5 gunshots looked out the window and observed 3 M/WH's with white tee shirts running south on Mobile but did not see their faces

*Exhibit U*

CHICAGO POLICE DEPARTMENT
DETECTIVE DIVISION
SUPPLEMENTARY REPORT

R.D. B 394 733
28 Jun 97.
PAGE # 2

All descriptions and statements in this entire report are approximations or summarizations unless indicated otherwise.

*OFFENDER VEHICLE:           Unknown year, Lincoln four door, dark top over light purple bottom, tinted side windows

*SERIAL NUMBERS:             DNA

*METHOD CODE:                DNA

*METHOD ASSIGNED CODE/UNIT:   1/650

VICTIM:                     GONZALEZ, Jorge  M/4/18  DOB 19 Nov 78
2212 N Mobile  house  Phone# 773 637 0265
SS# 341 84 5200
Gang Affiliation: unknown

ADDITIONAL VICTIMS:        CRUZ, Juan Carlos  M/4/16   DOB 22 Mar 81
2172 N Merrimac  basement
Phone# 773 637 3418
Student: Lawrence Hall, 10th grade
Gang Affiliation: Maniac Latin Disciple
(041A)

WANTED:                  3-4  M/4/late teens described as follows;

#1 M/4/approx. 18 yoa   5-09, 150lbs, wearing white t-shirt, blue jeans, armed with a handgun

#2  M/4/approx. 17 yoa   5-07, 170lbs, wearing white t-shirt, green shorts, armed with a handgun

#3 M/4/approx. 17-19 yoa  5-07, 170lbs, dark complexion

#4  M/4  N.F.D.

INJURIES:               GONZALEZ, Jorge (0110)
Two G.S.W. to upper right leg
One G.S.W. to right armpit
One G.S.W. to left front shoulder
Multiple G.S.W. outside of left upper arm
Multiple G.S.W. left side of face

CRUZ, Juan Carlos (041A)
G.S.W. to lower right leg

Exhibit V

STATE OF ILLINOIS )
) SS
COUNTY OF *Randolph* )

## AFFIDAVIT

I, Rosendo Hernandez Jr. _____ being first duly sworn upon my oath depose and state that the following matters are both true and correct made upon personal knowledge and belief, and if called as a witness, I am competent to testify thereto: On June 30th 1997 I turned myself into Police at Grand and Central Police Station. My Attorney Kent Brody was Present with me and he did not informe me to remain silent, infact he informed me to answer any and all questions that the Police asked me. detectives then proceded to question my parents as to my where abouts on Saturday 28th 1997. Detectives asked me as to my where abouts on June 28 1997 and they then concluded that my parents recollection contradicted mine on that date. June 28 1997 was not the date that the shooting was committed, the date in question was in fact June 27 1997, so why would my parents recollection of events on that saturday concerning my movements have to be in accord. If they were differemt so be it but contradicted was a poor choice of words. Had my Attorney informed me to remain silent there would have been no way that the detectives would have been able to say that our statements contradicted each other. My Attorney at the time was Kent Brody. This questioning took place after I was supposidly picked out of a photo erray and also pointed out of line-up. I should have been advised by Attorney not to answere any questions, and they would have put me in lock up at that time, so this question was done after the fact which should have been never allowed to take place by my Attorney. The sequence of events are impractical. All of what Detectives Halvorsen and Guevara are doing after the fact should have been done befor the Line-Up. Once the person is positively identified as the offender in the case the investigation on the part of the Detectives is over.

Subscribed and sworn to
before me on the 21st day
of *April*, 2003.

*Regina Summers*
NOTARY PUBLIC

Respectfully submitted,

*Rosendo Hernandez*
Rosendo Hernandez Jr.

"OFFICIAL SEAL"
Regina Summers
Notary Public, State of Illinois
My Commission Exp. 07/21/2005

Exhibit W